# EXHIBIT 6

# EXHIBIT 6

# United States District Court
# Eastern District of New York

---------------------------------------------------------------------X

EMANUEL A. TOWNS,

                               JURY TRIAL DEMANDED

                               Docket No. 14 CV 6809
                               Assigned Judge

                         **Hon. Kiyo A. Matsumoto**
                             (KAM) (LB)
                     Plaintiff,

                         **PROPOSED**
                         **THIRD AMENDED**
        -against-               **VERIFIED COMPLAINT**

CORNERSTONE BAPTIST CHURCH, LAWRENCE E. AKER III
FRANK TIMOTHY FRALEY, JAMES CHAVIS, SR.,
ALI BYRD, DENNIS H. HENSON, CHRISTINE WEBB,
BYRON HOWELL, ELLA PARKS, REGINALD SHELL,
IRVING HICKS, CLIFFORD SWANN, IRWIN WOOD,
KYLE LANE, ALEXANDER SPELLMAN, JESSE MOORE,
AMAZIAH HOWELL, PRESTON COSTON,
ALVIN COX, ANTHONY PRICE, JEROME ROCK,
JAMES CHAVIS, JR., each in their Respective
Official and Individual Capacities, and
RON SAES 1-15 and RACHAEL LOES 1-15, each in
their Respective Official and Individual Capacities,

ATTORNEY GENERAL ERIC T. SCHNEIDERMAN,
in his Official Capacity, MICHAEL R. BLOOMBERG,
in his official capacity, BILL dE BLASIO, in his
official capacity, CITY OF NEW YORK,
RAYMOND W. KELLY, in his official and individual capacity,
WILLIAM J. BRATTON, in his official capacity,
                         Defendants.

---------------------------------------------------------------------X

## ADDITIONAL DEFENDANTS

---------------------------------------------------------------------------X

NEW YORK CITY POLICE DEPARTMENT and
JOHN DOES 1-15 and JANE ROES 1-15,
each in their Respective Official and Individual Capacities.
CHARLES HYNES, in his Official and Individual
Capacities, and SAM SOES 1-10 and SANDIE COES 1-10
KEN THOMPSON, in his official capacity,
and THE DISTRICT ATTORNEY
OF KINGS COUNTY,

                                        Defendants.
---------------------------------------------------------------------------X

𝕾𝖎𝖗𝖘:

Plaintiff, Emanuel A. Towns, as and for his Verified Complaint respectfully
alleges and shows to this Court as follows:

### NATURE OF THE ACTION

1) Forty-three (43) years after a landmark civil rights case plaintiff, Emanuel
A. Towns, a black American, is calling upon our judicial system to enforce the
provisions of the Thirteenth Amendment against the descendants of former
slaves.

2) Plaintiff Towns is entitled to recover pecuniary damages for the defendants'
violation of a number of our nation's most fundamental and basic rights, that is,
his right to worship at the church of his choice and when requested to speak
religious beliefs whether favored or disfavored.

3) Plaintiff Towns' right to worship, exercise his right to firmly held religious beliefs and freedom of speech have been bedrock liberties of America since its foundation.

4) That the within named defendants' mutual pact and/or conspiracy to extirpate plaintiff Towns' fundamental right to walk upon the defendant, Cornerstone Baptist Church's, property and/or enter into its sanctuary of worship and to be led to believe that he was a fugitive from justice because he did openly exercise his religious freedom and right of free speech ought to cause trepidation and concern.

5) Yet, in the face of forty-three (43) years of unswerving Supreme Court adjudication we find that the defendants, New York City Police Department (hereinafter referred to as defendant NYPD) and former District Attorney Charles Hynes (hereinafter referred to as defendant Hynes) openly conspiring with a private church entity and/or private parties to knowingly violate plaintiff Towns' most cherished liberties as admitted by defendants James Chavis, Sr., and Ali Byrd. See, *Exhibit A*, a true and complete copy of the Terror Threat, issued and/or promulgated on or about October 10th, 2013)

6) For the conduct at issue in this case is conduct that no civilized society can allow and expect to endure.

3

7) Plaintiff Towns is also entitled to recovery of compensatory and punitive damages for the purposeful, calculated and egregious violation of his personal federal, state and/or municipal constitutional, civil rights and/or other rights of the plaintiff, Emanuel A. Towns, (hereinafter referred to as *plaintiff Towns*), by the within named defendants Cornerstone Baptist Church, Lawrence E. Aker III (hereinafter referred as defendant Aker), Frank Timothy Fraley (hereinafter referred to as defendant Fraley), James Chavis, Sr. (hereinafter referred as defendant Chavis, Sr.), Ali Byrd (hereinafter referred to as defendant Byrd), Dennis H. Henson (hereinafter referred to as defendant Henson), Christine Webb (hereinafter referred to as defendant Webb), Byron Howell, Reginald Shell (hereinafter referred to as defendant Shell), defendant, Ella Parks (hereinafter referred as defendant Parks), Irving Hicks (hereinafter referred to as defendant Hicks), Clifford Swann (hereinafter referred to as defendant Swann), Irwin Wood (hereinafter referred to as defendant Wood), Kyle Lane (hereinafter referred to as defendant Lane), Alexander Spellman (hereinafter referred to as defendant Spellman), Jesse Moore (hereinafter referred to as defendant Moore) Amaziah Howell, Preston Coston (hereinafter referred to as defendant Coston), Alvin Cox (hereinafter referred to as defendant Cox), Anthony Price, (hereinafter referred to as defendant Price) Jerome Rock (hereinafter referred to as defendant Rock) and /or certain officials, officers and/or persons acting individually and/or in their official capacity on behalf of said defendant Cornerstone Baptist Church unknown to plaintiff Towns at this time.

4

## JURISDICTION AND VENUE

8)  This action is brought pursuant to 42 U.S.C. §§ 1981, 1983 and 1985(3); and/or the First, Fourth, and/or Fourteenth Amendments to the United States Constitution and the laws of the State of New York. Jurisdiction is founded upon 28 U.S. C. §§ 1331, 1343(1-4), and §§2201 - 2202.

9)  Plaintiff Towns further invokes the supplemental jurisdiction of this Court to adjudicate pendant state law claims pursuant to 28 U.S.C. § 1367.

10)  Venue is proper in this district under 28 U.S.C. §1391(b)(1) and/or (b)(2).

11) In addition, thereto, plaintiff Towns effected service of Notice of Claims against the defendants City of New York and the New York City Police Department.

12) Said service of plaintiff Towns' *Notice of* Claim was made as follows:

    a) On January 8th, 2014, plaintiff Towns did serve a copy of his *Notice of Claim* as pertained to said defendant, New York City Police Department's actions on Sunday, October 13th, 2013, by Certified Mail to The Comptroller of the City of New York, Municipal Building – Room 1225, 1 Centre Street, New York, New York 1007.

    b) A true copy of the same is annexed hereto as *Exhibit B.*

c) On January 9th, 2014, plaintiff uploaded a copy of a separate *Notice of Claim* to the said Comptroller of New York City.  A true copy of the same, together with the electronic mail receipt, are annexed hereto as *Exhibit C*

d) Said electronic *Notice of Claim* asserted the "Date of the Incident" was October 13th, 2013.

e) On January 9th, 2014, at 4:26 P.M., plaintiff Towns did personally deliver a copy of his Notice of Claim as pertained to defendant, New York City Police Department's actions on Sunday, October 13th, 2013.

f) Simultaneously, said plaintiff did personally deliver a *Notice of* Claim as pertains to defendant New York City Police Department's actions on Sunday, October 20th, 2013.

g) Said plaintiff did deliver said *Notice of* Claim on January 9th, 2014, at 4:24 P.M.

h) Thus, plaintiff Towns personally delivered two (2) copies of his *Notice of* Claim to the New York City Comptroller's Office located at 1 Centre Street, New York, New York, pertaining to the aforesaid two (2) incidents that are the subject of this lawsuit.

i) Annexed hereto and made a part hereof are the aforesaid *Notice of Claims*, the same designated as *Exhibits D and E*, said copies bearing the stamp "Received" of the defendant New York City.

## THE PARTIES

13) At all times hereinafter mentioned, plaintiff Towns resided at either 841 Jefferson Avenue, in the Borough of Brooklyn, County of Kings, City and State of New York, or 90 Tracey Place, Bergen County, Englewood, New Jersey 07631.

14) Plaintiff Towns is an ordained deacon of defendant Cornerstone Baptist Church and a former Men's Day Co-chair of said defendant Cornerstone Baptist Church.

15) Upon information and belief and at all times hereinafter mentioned, the defendant Cornerstone Baptist Church (hereinafter referred to as *defendant Cornerstone*) is a religious corporation with its principal offices located at 562-574 Madison Street, in the Borough of Brooklyn, County of Kings, City and State of New York.

16) Defendant Cornerstone Baptist Church has an official Board of Deacons that functions in a similar capacity as a corporate Board of Directors.

17) However, the defendant Cornerstone Baptist Church's Board of Deacons purports not to have operational control and/or influence over financial activities of defendant Cornerstone Baptist Church.

18) Defendant Aker , at all times hereinafter mentioned and upon information received from members of said defendant Cornerstone, is believed to currently

7

reside at 1281 President Street, in the Borough of Brooklyn, County of Kings, City and State of New York, 11213.

19) At all times hereinafter mentioned, defendant Aker is believed to be the duly elected pastor of defendant Cornerstone and functions as its chief executive officer. Said defendant Aker is sued herein in his official and individual capacities.

20) Defendant Fraley, at all times hereinafter mentioned and upon information received from online research, is believed to currently resides at 10 Tamerton Street, Mount Vernon, County of Westchester, New York, 10552.

21) At all times hereinafter mentioned, said defendant Fraley is believed to be an officer of defendant Cornerstone and is an ordained minister within said defendant Cornerstone. Said defendant Fraley is sued herein in his official and individual capacities.

22) Defendant Chavis, Sr., at all times hereinafter mentioned and upon information received from members of said defendant Cornerstone, is believed to currently reside at 138-05 234th Street, Rosedale, Borough and County of Queens, City and State of New York, 11422-1906.

23) At all times hereinafter mentioned, defendant Chavis, Sr., served as the Chairman of the Deacon Board of defendant Cornerstone. Said defendant Chavis, Sr., is sued herein in his official and individual capacities.

8

24) Defendant Byrd, at all times hereinafter mentioned and upon information received from members of said defendant Cornerstone, is believed to currently reside at 150 Prospect Park West, Apartment No. 6D, in the Borough of Brooklyn, County of Kings, City and State of New York, 11213.

25) At all times hereinafter mentioned, defendant Byrd served as the vice Chairman of the Deacon Board of defendant Cornerstone. Said defendant Byrd is sued herein in his official and individual capacities.

26) Defendant Henson, at all times hereinafter mentioned and upon information received from members of said defendant Cornerstone, is believed to currently reside at 352 Grand Avenue, in the Borough of Brooklyn, County of Kings, City and State of New York, 11213.

27) At all times hereinafter mentioned, defendant Henson was a member of the Deacon Board of defendant Cornerstone.

28) Upon information and belief and at all times hereinafter mentioned, said defendant Henson was, at various periods, simultaneously a member of the Board of Deacons and Board of Trustees of defendant Cornerstone.  Said defendant Henson is sued herein in his official and individual capacities.

9

29) Defendant Webb, at all times hereinafter mentioned and upon information received from members of said defendant Cornerstone, is believed to currently reside at 48 Alan Road, Spring Valley, County of Westchester, New York, 10977.

30) At all times hereinafter mentioned, defendant Webb was the Superintendent of Sunday School of defendant Cornerstone. Defendant Webb is sued herein in her official and individual capacities.

31) Defendant Byron Howell, at all times hereinafter mentioned and upon information received from members of said defendant Cornerstone, is believed to currently reside at 130-61 226th Street, Springfield Gardens, Borough and County of Queens, City and State of New York, 11413.

32) At all times hereinafter mentioned, defendant Byron Howell served as a member of the Deacon Board of defendant Cornerstone. Said defendant Byron Howell is sued herein in his official and individual capacities.

33) Defendant Parks, at all times hereinafter mentioned and upon information received from members of said defendant Cornerstone, is believed to currently reside at 114 Ryerson Street, in the Borough of Brooklyn, County of Kings, City and State of New York, 11205.

34) Upon information and belief and at all times hereinafter mentioned, defendant Parks served as a member of the Deaconess Board of defendant

Cornerstone and is currently the Chair of the Board of Trustees of said defendant Cornerstone.

35) Defendant Hicks, at all times hereinafter mentioned and upon information received from members of said defendant Cornerstone, is believed to currently reside at 109-04 177th Street, St. Albans, Borough and County of Queens, City and State of New York, 11433.

36) At all times hereinafter mentioned, defendant Hicks served as a member of the Deacon Board of defendant Cornerstone. Said defendant Hicks is sued herein in his official and individual capacities.

37) Defendant Swann, at all times hereinafter mentioned and upon information received from members of said defendant Cornerstone, is believed to currently reside at 1280 Troy Avenue, in the Borough of Brooklyn, County of Kings, City and State of New York, 11203.

38) At all times hereinafter mentioned, defendant Swann served as a member of the Deacon Board of defendant Cornerstone. Said defendant Swann is sued herein in his official and individual capacities.

39) Defendant Wood, at all times hereinafter mentioned and upon information received from members of said defendant Cornerstone, is believed to currently

11

reside at 267 Lewis Avenue, in the Borough of Brooklyn, County of Kings, City and State of New York, 11221.

40) At all times hereinafter mentioned, defendant Wood served as a member of the Deacon Board of defendant Cornerstone. Said defendant Wood is sued herein in his official and individual capacities.

41) Defendant Lane's, current residential address is unknown to plaintiff. However, said defendant Lane was personally served by effecting personal delivery of the within Summons and Complaint upon his attorney in this action, Fishlin & Fishlin.

42) Said service was effected on December 26th, 2014, and duly filed with the Clerk of this Court on January 20th, 2015.

43) At all times hereinafter mentioned, defendant Lane served as a member of the Deacon Board of defendant Cornerstone. Said defendant Lane is sued herein in his official and individual capacities.

44) Defendant Spellman, at all times hereinafter mentioned and upon information received from members of said defendant Cornerstone, is believed to currently reside at 201 Clinton Avenue - Apt 5D, in the Borough of Brooklyn, County of Kings, City and State of New York, 11205.

45) At all times hereinafter mentioned, defendant Spellman served as a member of the Deacon Board of defendant Cornerstone. Said defendant Spellman is sued herein in his official and individual capacities.

46) Defendant Amaziah Howell, at all times hereinafter mentioned and upon information received from members of said defendant Cornerstone, currently resides at 317A Halsey Street, Apt. No. A, in the Borough of Brooklyn, County of Kings, City and State of New York, 11216.

47) At all times hereinafter mentioned, defendant Amaziah Howell served as a member of the Deacon Board of defendant Cornerstone. Said defendant Amaziah Howell is sued herein in his official and individual capacities.

48) Defendant Cox, at all times hereinafter mentioned and upon information received from members of said defendant Cornerstone, is believed to currently reside at 516 East 56th Street, in the Borough of Brooklyn, County of Kings, City and State of New York, 11203.

49) At all times hereinafter mentioned, defendant Cox served as a member of the Deacon Board of defendant Cornerstone. Said defendant Cox is sued herein in his official and individual capacities.

50) Defendant Coston's, current residential address is unknown to plaintiff. However, said defendant Coston was personally served by effecting personal

delivery of the within Summons and Complaint upon his attorney in this action, Fishlin & Fishlin.

51) Said service was effected on December 26th, 2014, and duly filed with the Clerk of this Court on January 20th, 2015.

52) At all times hereinafter mentioned, defendant Coston served as a member of the Deacon Board of defendant Cornerstone. Said defendant Coston is sued herein in his official and individual capacities.

53) Defendant Moore's current residential address is unknown to plaintiff. However, said defendant Moore was personally served by effecting personal delivery of the within Summons and Complaint upon his attorney in this action, Fishlin & Fishlin.

54) Said service was effected on December 26th, 2014, and duly filed with the Clerk of this Court on January 20th, 2015.

55) At all times hereinafter mentioned, defendant Moore served as a member of the Deacon Board of defendant Cornerstone. Said defendant Moore is sued herein in his official and individual capacities.

56) Defendant Shell's current residential address is unknown to plaintiff. However, said defendant Shell was personally served by effecting personal

delivery of the within Summons and Complaint upon his attorney in this action, Fishlin & Fishlin.

57) Said service was effected on December 26th, 2014, and duly filed with the Clerk of this Court on January 20th, 2015.

58) At all times hereinafter mentioned, defendant Shell served as a member of the Trustee Board of defendant Cornerstone except is believed to may have terminated his position at some unknown point in time. Said defendant Shell is sued herein in his official and individual capacities.

59) Defendant Price's current residential address is unknown to plaintiff. However, said defendant Price was personally served by effecting personal delivery of the within Summons and Complaint upon his attorney in this action, Fishlin & Fishlin.

60) Said service was effected on December 26th, 2014, and duly filed with the Clerk of this Court on January 20th, 2015.

61) At all times hereinafter mentioned, defendant Price served as a member of the Deacon Board of defendant Cornerstone. Said defendant Price is sued herein in his official and individual capacities.

62) Defendant Rock's current residential address is unknown to plaintiff. However, said defendant Rock was personally served by effecting personal

delivery of the within Summons and Complaint upon his attorney in this action, Fishlin & Fishlin.

63) Said service was effected on December 26th, 2014, and duly filed with the Clerk of this Court on January 20th, 2015.

64) At all times hereinafter mentioned, defendant Rock served as a member of the Trustee Board of defendant Cornerstone. Said defendant Rock is sued herein in his official and individual capacities.

65) The aforesaid defendants Aker, Fraley, Chavis, Sr., Byrd, Henson, Webb Byron Howell, Shell, Parks, Hicks, Swann, Wood, Lane, Spellman, Moore, Amaziah Howell, Coston, Cox, Shell, Price and Rock are hereinafter collectively referred to as Cornerstone defendants.

66) Unknown defendants, Ron Saes 1-15 and Rachael Loes 1-15, are sued in their official capacities and individual capacities.

67) Plaintiff Towns believes defendants Ron Saes 1-15 and Rachael Loes 1-15 were officers and/or members of defendant Cornerstone and actively engaged in the malicious, wrongful, malevolent and/or conspiratorial acts hereinafter set forth.

68) Defendant City of New York, also known as New York City (hereinafter referred to as *defendant City*) is a municipal entity created and authorized under

the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement, criminal investigation, protective functions and/or related activities under applicable laws.

69) At all times hereinafter mentioned, defendant Michael Bloomberg was the Mayor of defendant City (hereinafter referred to as *defendant Bloomberg*). Defendant Bloomberg was the chief executive officer of defendant City, at all times hereinafter mentioned. As such, he was responsible for the actions and/or policies of the defendant New York City Police Department (hereinafter referred to as *defendant NYPD*), and the effectiveness and integrity of the City's government operation.

70) Furthermore, said defendant Bloomberg was under a legal obligation to protect persons in the defendant City's territorial jurisdiction from state created threats, whether explicit or implicit, actions and/or inactions that emboldened private citizens to injure, intimidate and/or harass others; in addition thereto said defendant Bloomberg was responsible for taking steps and/or implementing procedures that minimized risks of state created threats and/or actions that emboldened private citizens to injure others and/or to prevent employees of defendant City from assisting in creating and/or increasing danger to innocent persons.

71) Moreover, said defendant Bloomberg was under constitutional and/or statutory mandate to take steps and/or implement procedures that provided means by which his appointed supervisors, commissioners and/or other heads of defendant City's agencies would be able to accurately ascertain, coordinate and/or have notice of defects, omissions, oversights, failings and/or other information required to protect persons within defendant City's jurisdiction from state created threats and/or actions that emboldened private citizens to injure others and/or to prevent employees of defendant City from assisting in creating and/or increasing danger to innocent persons.

72) In addition thereto and upon information and belief, said defendant Bloomberg was responsible for establishing and/or maintaining such policies and procedures as required to effectuate the hereinabove responsibilities. Defendant Bloomberg is sued in his individual and former capacity as Mayor of defendant City.

73) Upon information and belief, defendant Bill De Blasio is the Mayor of defendant City (hereinafter referred to as defendant De Blasio). Defendant De Blasio is the successor chief executive officer of defendant City; at all times hereinafter-mentioned said defendant is named in such official capacity as the successor to defendant Bloomberg pursuant to *Federal Civil Rules of Procedure*, Rule 25(d).

74) Upon information and belief, defendant Raymond Kelly (hereinafter referred to as *defendant Kelly*) was the defendant NYPD's Commissioner at all times hereinafter mentioned.

75) Upon information and belief, said defendant Kelly was appointed by the defendant Bloomberg and was the chief executive officer of the defendant NYPD, said office believed to be known as Commissioner of Police. Among other duties, defendant Kelly was responsible for the actions and policies of the defendant NYPD, and for the execution of all the laws and/or the rules and/or regulations of New York State, the defendant City and/or the defendant NYPD.

76) Furthermore, said defendant Kelly was under a legal obligation to protect persons in the defendant City's territorial jurisdiction from state created threats, whether explicit or implicit, actions and/or inactions that emboldened private citizens to injure others; in addition thereto, for taking steps and/or implementing procedures that minimized risks of state created threats and/or actions that emboldened private citizens to injure others and/or to prevent employees of defendant City from assisting in creating and/or increasing danger to innocent persons.

77) Moreover, said defendant Kelly was under constitutional and/or statutory mandate to take steps and/or implement procedures that provided means by which his appointed supervisors and/or appointed personnel of defendant NYPD

would be able to accurately ascertain, coordinate and/or have notice of defects, omissions, oversights, failings and/or other information required to protect persons within defendant City's jurisdiction in order to prevent state created threats and/or actions that emboldened private citizens to injure others and/or from employees of defendant City from assisting in creating and/or increasing the danger to innocent persons.

78)   In addition thereto and upon information and belief, said defendant Kelly was responsible for establishing and/or maintaining such policies and procedures as required to effectuate the hereinabove responsibilities.

79) Moreover, defendant Kelly was under the obligation to implement such policies that identified and rooted out practices that led to defendant NYPD's employees' unlawful and/or unconstitutional actions against blacks, Hispanics and/or persons of color and/or otherwise profiling such persons.

80) Additionally, said defendant Kelly was responsible for taking steps needed to effectively discipline employees of defendant NYPD, wholly comprehending that said defendant NYPD employees were vested with the unique authority to exercise and utilize lethal, deadly force and to create, generate and/or implement policies that assured said employees would conduct themselves in a manner that respected and adhered to constitutional and/or authority.

81) Defendant Kelly is sued in his individual and former capacity as Commissioner of defendant NYPD.

82) Defendants John Does 1-15 and Jane Roes 1-15 were acting under color of state law in the course and scope of their duties and functions as officials, employees and/or agents of the City Departments, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties

83) At all times hereinafter mentioned, and upon information and belief John Does 1-15 and Jane Roes 1-15 were actively engaged in police operations as pertained to communication, investigation, tactical logistics, strategic operations and/or related procedures as pertained to defendant NYPD's presence on October 13th, 2013 and/or October 20th, 2013, at the defendant Cornerstone's location and/or locations in Brooklyn, New York.

84) Upon information and belief, defendant William J. Bratton, (hereinafter referred to as *defendant* Bratton) is the successor Police Commissioner to defendant Kelly and and is named in such official capacity as the successor to defendant Kelly pursuant to *Federal Civil Rules of Procedure*, Rule 25(d).

85)

86) Upon information and belief and at all times hereinafter mentioned, defendant Charles Hynes (hereinafter referred to as *defendant Hynes*) was the District Attorney of Kings County.  In said capacity, he was responsible to establish and maintain such policies and/or procedures as were necessary and appropriate to accomplish his responsibility as District Attorney.

87) Upon information and belief and at all times hereinafter mentioned, defendant Hynes was responsible for the effectiveness and/or integrity of the defendant District Attorney's Office of Kings County in its prosecutorial operation.

88) Defendant Hynes is sued in his official capacity and/or personal capacity.

89) Defendant, Ken Thompson is the successor District Attorney to defendant Hynes and is named herein in such official capacity; furthermore, said defendant is the successor to defendant Hynes and is so designated pursuant to *Federal Civil Rules of Procedure*, Rule 25(d).

## FACTUAL STATEMENT OF PLAINTIFF TOWNS' CLAIMS[1]

---

[1]     This Court is respectfully reminded of *Ashcroft, et al v. Iqbal, et al*, 556 U.S. 662; 129 S. Ct. 1937; 173 L. Ed. 2d 868; 2009 U.S. LEXIS 3472; 77 U.S.L.W. 4387, that admonishes plaintiffs of the distinction that must be established between allegations, which merely establish a possibility, and a factual "showing," which need not establish a probability but must at least be sufficient to allow the court to "draw the reasonable inference" of liability. *Moore's Federal Practice* § 8.04[2][ (Footnotes omitted)

Additionally, Moore's also instructs plaintiffs that, "Additionally, courts have noted that greater factual detail in pleading is now required in order to demonstrate "'plausibility.'" n104 §8.04[6] (Footnotes Omitted)

90) At all times hereinafter mentioned, the plaintiff Towns was a citizen of the United States of America, and either resided at 841 Jefferson Ave., in the Borough of Brooklyn, County of Kings, City and State of New York, or 90 Tracy Place, Apartment C-2, in the County of Bergen, Englewood, New Jersey.

91) At all times herein at issue, plaintiff Towns attended services at the defendant Cornerstone.

92) Plaintiff Towns had attended the defendant church since his birth and had been a member of the defendant Cornerstone since approximately 12 years of age.

93) During the timeframe when plaintiff Towns initially worshipped at defendant Cornerstone he served in numerous capacities from his youth, including but not limited to a member of the defendant Cornerstone's Boys Choir, Young Peoples Choir, Sunday School, a youth leader, a member of the church laity, a member of the Cornerstone Deacon Board, a Co-chairman of Men's Day and the Cornerstone's attorney.

94) Plaintiff Towns and his wife ended their membership with defendant Cornerstone sometime in 1987, due to their desire to expand their theological foundation and understanding of their relationship with God and Jesus.

---

Thus, plaintiff Towns has set forth a detailed factual basis for his claims against all of the within named defendants and includes affidavits from two principal witnesses.

95) Plaintiff Towns reinitiated his participation in defendant Cornerstone's services in late December 2011.

96) Early in January 2012, plaintiff Towns started consistently attending one of the defendant Cornerstone's Sunday School Classes, to wit, a class devoted to leaders of said defendant Cornerstone.

97) The class instructor was the former Dean of Christian Education at the defendant Cornerstone, to wit, Mrs. Eartha Washington.

98) Notwithstanding that plaintiff Towns was not a formal member of defendant Cornerstone he openly and regularly participated in class discussions and Mrs. Washington occasionally requested said plaintiff to lead the class' biblical dialogues, as were other class members.

99) The overwhelming majority of the said Sunday School class' membership consisted of deacons, deaconesses and/or other defendant Cornerstone officers.

100) In addition to occasionally leading class biblical discussions, Mrs. Washington periodically tasked plaintiff Towns with presenting biblical proclamations before the entire Sunday School body concerning a religious topic that was selected by defendant Webb.

101) When defendant Webb chose such topics, she is believed to have acted in her capacity as Superintendent of Sunday School.

102) Plaintiff Towns rendered these theological presentations in defendant Cornerstone's main sanctuary.

103) Upon information and belief, during this entire period of time defendant Webb knew that plaintiff Towns was not a formal member of the defendant Cornerstone. Notwithstanding this fact, the said defendant Webb not only allowed plaintiff Towns to make such religious proclamations as his Sunday School class' spokesperson but also openly encouraged and applauded said plaintiff's religious pronouncements until September 29, 2013.

104) During the early period of plaintiff Towns' return to the defendant Cornerstone two (2) people approached said plaintiff and expressed their concern with respect to the operation of the defendant Cornerstone, the defendant Cornerstone's financial condition, its failure to have conducted required audits and the leadership of defendant Aker.

105) One of these persons was Mrs. Eartha Washington, plaintiff's Sunday School instructor.

106) Mrs. Eartha Washington urged plaintiff Towns to speak with Cornerstone members he had previously known concerning her personal disagreements with respect to defendant Cornerstone's operation and the leadership of defendant Aker.

107) Plaintiff Towns informed Mrs. Eartha Washington that he would do nothing other than to come and participate in her class and probably speak to other people with regard to the issues that she raised prior to making any determination as to whether or not to enter into the fray.

108) Plaintiff Towns spoke with various members of the defendant Cornerstone and ultimately agreed to apply for reinstatement as a member of the said defendant Cornerstone in order to assist with bringing resolutions to concerns that he had discovered.

109) As hereinabove stated, these concerns included, among other things, the defendant Cornerstone's officers and/or officials' failure to comply with the defendant Cornerstone's by-laws as pertained to providing annual audited statements for more than nine (9) years as of December 31st, 2014; additionally, Cornerstone's financial situation appeared to be rather dire based upon information that he had received from various people, including but not limited to former Chairman of the Board of Trustees, Mr. Ruben Braxton, Rev. Claudette Davis, Deacon David Perkins and Mrs. Eva Dozier.

110) Likewise, plaintiff Towns also discovered that defendant Aker conducted his pastoral duties in a highly tyrannical manner. That defendant Aker viewed defendant Cornerstone members either as enemies he would crush or allies he would coddle. Moreover, people asserted that said defendant Aker had publicly

berated Cornerstone members and/or sought to embarrass them at business meetings when they brought up issues concerning the Cornerstone's finances or matters of importance to them as members.

111) The final factor that led plaintiff Towns to conclude that he would seek to assist the disenchanted members was when Mrs. Eva Dozier informed plaintiff that a group of non-Cornerstone members and defendant Cornerstone members banded together to raise more than Sixty Thousand ($60,000.00) Dollars to purchase a new organ for defendant Cornerstone.

112) This community choir is known as the Ecumenical Choir of Bedford-Stuyvesant.

113) Mrs. Dozier pointed to the fact that after successfully completing their fund raising efforts, defendant Cornerstone and defendant Aker rewarded these good works with disdain.

114) In fact, the defendant Cornerstone and its officers have never invited the choir's members to perform at its facilities.

115) Plaintiff Towns firmly believes that "thank you" is common place within our secular society but the *New Testament* gospel pointedly instructs, "Give to everyone what you owe them: If you owe taxes, pay taxes; if revenue, then revenue;

if respect, then respect; if honor, then honor." Romans 13:7 in the *New International Version.*

116)  Finally, Cornerstone defendants had developed a reputation of running off those who questioned anything they did or would resort to beating them into submission.

117) Thus, due to the foregoing, plaintiff Towns applied for reinstatement of his membership in the defendant Cornerstone on Sunday, May 13th, 2012.

118) The process for becoming a member of the defendant Cornerstone consisted of attending four sessions of the defendant Cornerstone's New Members' Class. Upon completing the New Members' Class the prospective candidate would appear before the defendant Cornerstone's congregation on the third Sunday of a given month; a Cornerstone deacon moves the candidate's membership and a majority vote is required for approval of the prospective member's application.[2]

---

[2]     Plaintiff Towns recalls that during his training for ordination as a deacon he was apprised that once a defendant Cornerstone member was ordained he retained all rights and privileges as a deacon of said defendant Cornerstone.

       To wit, it was a courtesy afforded deacons that is similar to the courtesy afforded jurists, executives and/or legislative branch members throughout our country.

       Therefore, membership reinstatement was an automatic right that vested in plaintiff upon his ordination as a deacon at defendant Cornerstone .

119) Cornerstone officers and members then shake the hand of the new member, officially welcoming him or her into its fold.

120) Defendant Cornerstone conducted New Members classes on Sundays at 9 AM and as a result, plaintiff Towns ceased attending his regular Sunday School classes because the time conflicted with the New Members Class.

121) Plaintiff Towns attended New Members Class on Sunday, May 20, 2012, Sunday, May 27 2012, on Sunday, June 3, 2012 and again on Sunday, June 10, 2012.

122) Thus, plaintiff Towns was eligible to become a member of the defendant Cornerstone on Sunday, June 17, 2012, the third Sunday of that month.

123) Subsequent to his initial application for membership, plaintiff Towns openly spoke with various people concerning the aforesaid issues and/or concerns that had been raised.

124) Said plaintiff Towns explicitly stated his disapproval of defendant Aker's bullying management style and the fact that he utilized his position as the defendant Cornerstone's pastor-shepherd to embarrass, humiliate, intimidate and abuse Jesus' flock.

125) Said plaintiff Towns firmly believed that he had the right to express his views publicly as this was merely an exercise of his right of religion, freedom of

speech, right of protest and/or his right to freely and openly associate with whom he chose.

126)  Furthermore, plaintiff Towns only had these conversations by telephonic communication, electronic communication and/or during periods prior to the commencement of any given Cornerstone activity at the defendant Cornerstone or upon the conclusion of the same.

127)  It is also vital for this Court to know that during the months of May and June 2012, plaintiff Towns was voluntarily working with the moderator of the Community Awareness Ministry, to wit, Mrs. Eva Dozier. His volunteer time was devoted to assisting in developing programs that might benefit the members of defendant Cornerstone's congregation and the implementation of the same.

128)  After the initial conversation between the plaintiff and Mrs. Eva Dozier, Mrs. Dozier scheduled a meeting of the Community Awareness Ministry for May 5, 2012.  Plaintiff Towns and one other person met with Mrs. Dozier to develop programs for the upcoming summer months of 2012.

129)  During the meeting, we agreed that our group would generate a program for the purposes of notifying defendant Cornerstone's members of potential summer hazards and/or risks and the protocols members needed to implement in order to protect themselves and family members during the hot summer days.

130) Plaintiff Towns agreed to prepare a draft of the proposed program for Mrs. Eva Dozier's review.

131) As he had committed, plaintiff Towns prepared a draft program and presented the same to Mrs. Eva Dozier for her review and approval.

132) In due course Mrs. Eva Dozier reviewed and approved the proposed program with certain minor corrections and/or revisions.

133) That on or about Sunday, May 13, 2012, Mrs. Eva Dozier informed plaintiff Towns that she had presented the proposal to defendant Aker.  Mrs. Dozier explicitly stated that defendant Aker had approved the program we had named "Summer Hot Tips."

134) Mrs. Eva Dozier emphasized that defendant Aker said, "'This is good. We can do this. We have to talk this up.'"

135) Additionally, Mrs. Dozier, filled with enthusiasm, specifically noted to plaintiff Towns that she believed defendant Aker, as pastor, wanted the program to go forward "full blast."  This belief was based upon Mrs. Dozier report that defendant Aker had said, "We have to talk it up."  Moreover, Mrs. Dozier believed defendant Aker would announce the Summer Hot Tips program starting on Sunday, May 20th, 2013.

31

136) Mrs. Dozier also planned to have notifications placed in defendant Cornerstone's Herald.(Said defendant Cornerstone's official announcement bulletin)

137) As a result of defendant Aker's approval, Mrs. Eva Dozier and plaintiff Towns set a time when they would meet to review a draft flyer that said plaintiff would prepare.

138) It was Mrs. Dozier's intent to have the flyer serve as notice to defendant Cornerstone's members of the upcoming Summer Hot Tips program.

139) The Summer Hot Tips program was set to go forward on Sunday, June 17, 2012.

140) That on or about Monday, May 28, 2012, Mrs. Eva Dozier and plaintiff Towns met at the defendant Cornerstone for the purpose of reviewing the draft flyer. Mrs. Dozier wanted the flyer placed in the defendant Cornerstone's Herald for distribution on Sunday, June 10, 2012.

141) During the May 28th, 2012, meeting Mrs. Dozier reviewed the proposed flyer and made certain suggestions for modifications of same.

142) Plaintiff Towns and Mrs. Dozier agreed to meet on Monday, June 4, 2012, for Mrs. Dozier's final review of the revised flyer.

143)  On or about Monday, June 4, 2012, Mrs. Eva Dozier and plaintiff Towns met at the defendant Cornerstone and Mrs. Dozier specifically approved the flyer's final version.

144)  Additionally, Mrs. Eva Dozier directed and authorized plaintiff Towns to take the flyer to the defendant Cornerstone's office to be printed and placed in the Cornerstone's Herald for distribution on Sunday, June 10, 2012.

145) In addition thereto,  Mrs. Eva Dozier and plaintiff Towns discussed her concern that she had not received any follow-up information or input from defendant Aker since their initial May 13, 2012, discussion about the Summer Hot Tips program. Therefore, Mrs. Dozier agreed to speak to the said defendant Aker at the end of the defendant Cornerstone's Thursday, June 6th, 2012, Prayer Meeting.

146) Moreover, upon information and belief, though defendant Aker had proclaimed that the Summer Hot Tips program had to be "talk[ed] up" defendant Aker had never mentioned the program at any Cornerstone service. Consequently, Mrs. Dozier and plaintiff Towns also wanted defendant Aker's assurance that the program was moving forward, as intended.

147)  As heretofore stated, at various times during this period Mrs. Eva Dozier would remind plaintiff Towns about the charitable work of the Ecumenical Choir of Bedford-Stuyvesant on behalf of defendant Cornerstone.

148) More particularly, Mrs. Dozier informed plaintiff Towns of her membership in the Ecumenical Choir of Bedford-Stuyvesant and that it was formed for raising funds needed to purchase a new organ for defendant Cornerstone.

149) Said Ecumenical Choir of Bedford-Stuyvesant successfully raised and donated more than $60,000.00 to defendant Cornerstone, an amount sufficient for the purchase of defendant Cornerstone's new organ.

150) Mrs. Dozier further informed plaintiff Towns that the said Ecumenical Choir of Bedford-Stuyvesant did not have a performance site for its upcoming 2012 Summer Concert.

151) As plaintiff Towns had developed an informal relationship with one of the 2012 Men's Day co-chairman to wit, defendant Rock, plaintiff reached out to said defendant Rock with a suggestion as pertained to the Ecumenical Choir of Bedford Stuyvesant.

152) Plaintiff Towns initially informed said defendant Rock of the plight of the Ecumenical Choir of Bedford-Stuyvesant and the history of its financial contributions to defendant Cornerstone.

153) Plaintiff Towns also advised the defendant Rock that he had been a co-chair of Men's Day in the mid-1980s.

34

154)  Plaintiff Towns suggested to defendant Rock that the Ecumenical Choir of Bedford Stuyvesant could render its Summer Concert at defendant Cornerstone and an offering would be taken during the concert.

155)  The choir and Men's Day committee would divide the offering in whatever manner they agreed.

156)  So that the defendant Rock would have a convenient document of the aforesaid conversation plaintiff Towns emailed the aforesaid suggestion to said defendant Rock.

157)  Upon information and belief, this email miraculously found its way to the members of defendant Cornerstone's Board of Deacons.

158)  Upon information and belief, defendant Rock forwarded the aforesaid email to one or more of the within named Cornerstone defendants.  This resulted in defendant Chavis, Sr., directing plaintiff Towns to attend an impromptu meeting of defendant Cornerstone's deacons at the conclusion of church service on or about Sunday, June 3rd, 2012.

159) Said defendant Chavis, Sr., issued this direction in his capacity as Chairman of defendant Cornerstone's Deacon Board.

160)  Plaintiff Towns attended the off-the-cuff meeting.

161)  Plaintiff Towns believes that defendants Chavis, Sr., Fraley, Byrd, Henson, Chavis, Jr., and Rock attended this impromptu meeting.

162)  Said defendants Chavis, Sr., Fraley, Byrd, Henson, Chavis, Jr., chastised plaintiff Towns for suggesting to defendant Rock that the Men's Day Committee and Ecumenical Choir of Bedford-Stuyvesant jointly sponsor a concert.

163)  This deacon assemblage stated that defendant Cornerstone had a committee of deacons known as the Deacon Board Policy Committee or the Deacon Policy Board that had the duty of pre-approving programs such as ones plaintiff Towns had proposed.

164)  Additionally, they collectively criticized the concept of co-sponsoring such an event based upon the prior works of the Ecumenical Choir of Bedford-Stuyvesant, including said choir's charitable work on behalf of defendant Cornerstone.

165)  Defendant, James Chavis, Jr., emphatically stressed that the defendant Cornerstone owed no thanks or appreciation for the free-will services of the Ecumenical Choir of Bedford-Stuyvesant and its membership.[3]

---

[3]      The Court is informed that the Ecumenical Choir of Bedford-Stuyvesant's membership includes a number of persons who are members of congregations other than defendant Cornerstone .

166)  Said deacons also directed that funding for the Summer Hot Tips program required an itemized statement of expenses for their review and approval.

167)  No deacon posed any objection or complaint pertaining to the Summer Hot Tips program during the course of this unarranged encounter or objection to plaintiff Towns' volunteer participation in working on the said program. (Though averred at ¶¶ 191-192, Pg. 42 below, plaintiff Towns' fund raising suggestions became an added pretextual justification for the spiteful conduct toward said plaintiff on June 10th, 2012.)

168)  The deacons present only stated that there would be no splitting and/or sharing of funds between the Men's Day Committee and the Community Awareness Ministry.

169)  It has become evident that this meeting was defendants Aker, Fraley, Byrd, Henson, and/or Chavis, Sr.'s initial salvo in their effort to dissuade plaintiff Towns from openly and freely exercising his constitutional, statutory and/or civil rights, including but not limited to religious beliefs, as more particularly set forth *infra*, at ¶¶ 260-261 at Pgs. 57-58.

170)  Subsequent to the aforesaid improvised meeting, plaintiff Towns spoke with Mrs. Dozier and informed her of the issues raised and comments made at the meeting.

171)  Plaintiff Towns prepared an Amended Proposal that itemized the expenses and set forth the potential income that the programs would generate.  Plaintiff Towns prepared the Amended Proposal because of criticisms made by defendants Chavis, Sr., Fraley, Byrd, Henson and Chavis, Jr., during the June 3rd, 2012, meeting.

172)  Pursuant to Mrs. Eva Dozier's direction plaintiff Towns, appeared at the offices of the defendant Cornerstone on or about Wednesday, June 6, 2012, to ask the staff to print the Summer Hot Tips flyer for distribution.

173)  The said defendant Cornerstone's office staff spoke directly with Mrs. Eva Dozier and verified that she had authorized plaintiff Towns to request that defendant Cornerstone's staff print the Summer Hot Tips flyers and put them in the defendant Cornerstone's Herald.

174)  On or about the night of June 7, 2012, Mrs. Eva Dozier informed plaintiff Towns that there would be no presentation of the proposed Summer Hot Tips program, for defendant Aker proclaimed he would not permit a PowerPoint presentation during morning church services.

175)  Mrs. Eva Dozier expressed shock at defendant Aker's statement.

176)  Moreover, defendant Aker's assertion was stunning for its lack of candor given that virtually every Sunday, defendant Cornerstone used PowerPoint presentations to make its weekly announcements.

177)  Plaintiff Towns and Mrs. Eva Dozier discussed the prospects of making a formal motion at the upcoming Saturday, June 10th, 2012 semiannual defendant Cornerstone business meeting. The intent was to have the membership authorize Mrs. Dozier's Summer Hot Tips program and thus, it would proceed on Sunday, June 17th, 2012, as planned.

178)  Plaintiff Towns offered to prepare a statement summarizing the Community Awareness Ministry's efforts and achievements during the first six (6) months of 2012, and Mrs. Eva Dozier would then present a motion to the body to allow the Summer Hot Tips program to proceed as planned.

179)  Mrs. Eva Dozier requested that the plaintiff Towns prepare such a summary report.

180)  Hence, plaintiff Towns prepared the summary report together with a formal motion for Mrs. Eva Dozier to use at the aforesaid semi-annual meeting.

181) Plaintiff Towns personally appeared at the Saturday, June 9th, 2012, semi-annual meeting of the defendant Cornerstone but defendant Cornerstone officials ordered him to leave from the meeting because he was not a member.

182) Plaintiff Towns left the meeting as instructed.

183) Mrs. Eva Dozier later reported that she was not afforded an opportunity to make a full report or petition the assembly to permit the Summer Hot Tips programs to proceed.

## THE VENDETTA

184) In their effort to further discourage plaintiff Towns' effort to freely and openly exercise his religious beliefs, worship in the manner that he had chosen and/or for utilizing his free speech right of expression and/or associating with whom he had chosen and/or speaking in the manner he had chosen and/or for exercising other constitutional and/or civil rights the defendants Aker, Fraley, Chavis, Sr., Henson, Byrd, Brown and/or Ron Saes 1-15 and/or Rachael Roes 1-15 effectuated their plan to suspend plaintiff Towns' membership application.

185) More explicitly, defendant Chavis, Sr., approached plaintiff Towns at the end of Cornerstone service on Sunday, June 10, 2012.   Defendant Chavis, Sr., demanded that plaintiff Towns attend an impulsive meeting of deacons concerning his membership application.

186) Upon information and belief, said defendant Chavis, Sr., was acting in his capacity as chairman of the Deacon Board of defendant Cornerstone and pursuant to the direction, request and/or importuning of the defendants Aker, Fraley

and/or other persons and/or other defendants unknown to the plaintiff Towns at this time.

187) Defendant Chavis, Sr., took plaintiff Towns into a private conference room of defendant Cornerstone. Defendant Fraley together with a number of defendant Cornerstone's deacons, confronted plaintiff Towns and accused him of misconduct.

188) Plaintiff Towns recalls that defendants Fraley, Chavis, Sr., Henson, Byrd, Brown and approximately two (2) other deacons attended this improvised session.

189) Said defendants Fraley, Chavis, Sr., Henson, Byrd, Brown, et al., maintained that plaintiff Towns did the following wrongful acts:   First, that plaintiff Towns had the nerve to assist Mrs. Eva Dozier with the Summer Hot Tips program when he was not yet a member of defendant Cornerstone.

190) Second, that plaintiff had the Summer Hot Tips flyer printed by defendant Cornerstone's staff without authorization and/or permission.

191) Thirdly, that plaintiff Towns proffered a suggestion to one of the co-chairman of the Men's Day committee to sponsor a concert featuring the Ecumenical Choir of Bedford-Stuyvesant, without obtaining the permission of an entity known as the Deacon Policy Committee and/or Board.

192) Fourth and finally, these defendants charged plaintiff Towns with suggesting that the Community Awareness Ministry and the Men's Day Committee jointly sponsor the Summer Hot Tips program.

193) In essence, plaintiff Towns was charged with misconduct for exercising his first amendment right to make a proposal to assist in defendant Cornerstone's fund raising efforts.[4]

194) Plaintiff Towns responded to the charge that he improperly had the Summer Hot Tips flyer printed by the defendant Cornerstone staff by insisting that the off-the-cuff meeting was completely improper because Mrs. Eva Dozier was not present.

195) Plaintiff Towns insisted Mrs. Dozier address the charge because she, as the moderator of the Community Awareness Ministry, would either confirm or deny whether she directed plaintiff Towns to ask defendant Cornerstone's staff to print the flyers at issue.[5]

---

[4]     Plaintiff Towns' fund raising capacity was one of the essential reasons for the former pastor designating him as lead chair in an earlier Men's Day campaign.

[5]     In her March 9th, 2015, Affidavit Mrs. Eva Dozier swore as follows:

Pursuant to your deponent's instructions, Emanuel appeared at the offices [*sic*, of] Cornerstone Baptist Church on or about Wednesday, June 6, 2012, for the purposes of requesting that defendant church's office staff print the Summer Hot Tips flyer for distribution, as hereinabove stated.

Your deponent specifically recalls that she spoke with Mrs. Florence Agnew  and verified that your deponent had directed Emanuel to request that the church's staff print the Summer Hot Tips flyer and have it placed in the church's Herald.

196)  However, the said Cornerstone defendants Fraley, Chavis, Sr., Henson, Byrd and/or Brown fixated on their goal of declining plaintiff Towns Cornerstone membership and insisted on continuing with this oppressive session.  Thus, said defendants pursued their persecution of plaintiff Towns without paying any heed to the truth or falsity of the charges made.

197)  Defendant Fraley took the lead in harassing plaintiff Towns with respect to the claim that plaintiff Towns had improperly and without authority misinformed the defendant Cornerstone's staff that Pastor Aker approved the Summer Hot Tips program.

198)  Said defendant Fraley further maintained that plaintiff Towns had erroneously submitted to the defendant Cornerstone's staff a proposal for the Summer Hot Tips program that contained a watermark stating, "APPROVED."

199)  Plaintiff Towns again responded by reminding said Cornerstone deacons and defendant Fraley that Mrs. Eva Dozier explicitly informed said plaintiff that defendant Aker had approved the Summer Hot Tips program and apprised said plaintiff of that fact. Said plaintiff pressed the point that it was imperative for the

---

Any claim by the defendant Church, its pastor and/or officers to the contrary is false. See, ¶¶ 36-38 @ Pgs. 7-8  (A true and complete copy of the same is annexed hereto and designated as *Exhibit F*)

43

current deacon assembly to have Mrs. Eva Dozier present for the purposes of announcing whether or not the statements that plaintiff Towns made were true.

200) Defendant Fraley stood up and screamed out words to the effect, "Are you calling the defendant Aker a liar?"

201) At that point, several other Cornerstone defendants in the room began to speak and urge that the assembled deacons address the other charges and then state their conclusion on the matter.

202) As to the charge that plaintiff Towns provided volunteer services to defendant Cornerstone while not a member, plaintiff Towns proclaims, though not noted during the course of the improvised meeting, that upon information and belief it is a general practice for non-members of the defendant Cornerstone to participate and actively engage in defendant Cornerstone's activities and ministries.

203) As hereinabove recited, plaintiff Towns served as class leader of discussions in his Sunday School class on various occasions. Moreover, plaintiff Towns also was a principal speaker at Sunday School morning worship services on a number of occasions, and had received the encouragement of the said Superintendent of Sunday School, defendant Webb, until September 29th, 2013.

204) Addressing the rather odd charge of Plaintiff Towns' suggestions for fundraisers by the Men's Day Committee plaintiff emphasized to the defendant Cornerstone's deacons of this extraordinary gathering that he only made two proposals, suggestions to a Men's Day cochairman, to wit, defendant Rock.

205) Plaintiff Towns definitively asserted that he took not a single step to implement said suggestions nor did said defendant Cornerstone's deacons accuse him of such.

206) Moreover, plaintiff Towns predicated these suggestions based upon his personal experience as a former Men's Day co-chair of defendant Cornerstone and plaintiff's prior fund raising efforts.

207) Said Cornerstone defendants Fraley, Chavis, Sr., Henson, Byrd and/or Brown summarily suspended plaintiff Towns' membership application for membership in defendant Cornerstone, without date.   Said Cornerstone defendants stated that they would investigate the charges.

208) Members of this impromptu group informed Plaintiff Towns that they should complete their investigation in September 2012, when the Deacon Board returned from its summer recess.

209) Again, said defendants had now escalated their endeavors to frustrate plaintiff Towns' rights, as heretofore mentioned.[6]

210) Immediately after the said meeting, plaintiff Towns spoke with Mr. Reuben Braxton (hereinafter refer to as *Braxton*), Rev. Claudette Davis (hereinafter refer to as *Rev. Davis*) about the meeting and told them his membership application had been suspended.

211) Rev. Davis, Mr. Braxton and plaintiff Towns immediately agreed that plaintiff Towns would notify all persons he had previously spoken with about the improvised deacon's meeting and plaintiff Towns' membership application suspension.

212) Plaintiff Towns then notified the following members of defendant Cornerstone: Mrs. Eartha Washington, Deacon David Perkins, Mrs. Eva Dozier, Mr. Bennie Denson and at least one other person.

213) Ultimately, these persons unanimously agreed that they would meet on or about July 25th, 2012, to address their mutual concerns with the defendant Cornerstone, including the conduct of defendant Aker and the refusal to afford plaintiff Towns membership in the defendant Cornerstone.

---

[6]     Plaintiff stresses that none the foregoing does not form the predicate for plaintiff's claims but establishes Cornerstones defendant's state of mind, predisposition and/or motivation to forever silence plaintiff.

46

214) Furthermore, these concerned members universally understood and acknowledged that the act of suspending a person's membership was unprecedented in the Baptist community.

215) During the meeting of July 25th, 2012, Deacon Perkins urged this small group to focus their efforts on gaining membership for plaintiff Towns.

216) Ultimately, a number of these concerned members ceased to participate but a core of the original members continued to meet and seek membership for plaintiff Towns.

217) Months passed without any definitive response to inquiries made concerning plaintiff Towns' pending membership.

218) On or about September 2nd, 2012, Mrs. Eva Dozier issued a letter to defendant Chavis, Sr., officially informing him that said plaintiff Towns acted solely on her specific assurance that defendant Aker had approved the Summer Hot Tips Program.

219) Mrs. Dozier further stated, "It saddens me that my brother, Emanuel, has been rewarded with evil for the good and faithful work that he performed at my request and direction."

220) In concluding her letter to defendant Chavis, Sr., Mrs. Dozier insisted that the Board of Deacons correct the injustice done to plaintiff Towns by

47

affording him full membership in defendant Cornerstone.  (Please see, Mrs. Dozier's Affidavit at ¶¶ 44-49, at Pg. 9, therein; Annexed hereto as *Exhibit F.)*

221)  The inaction of defendant Cornerstone's Deacon Board continued and on November 17th, 2012, Mr. Reuben Braxton, Rev. Claudette Davis and Mr. Bennie Denson issued a letter to defendant Chavis, Sr., and other members of the defendant Cornerstone's Deacon Board demanding to know the said defendants' justification for their ongoing refusal to grant membership to plaintiff Towns in the defendant Cornerstone.

222)  That letter resulted in a meeting with plaintiff Towns, Braxton and Rev. Davis and several members of defendant Cornerstone's Deacon Board.

223)  This meeting is believed to have occurred on a Sunday in early December 2012.

224)  Plaintiff Towns believes, *inter alia*, Cornerstone defendants Fraley, Chavis, Sr., Byrd, Hicks and Henson were participants in said meeting.

225)  Said Cornerstone defendants Fraley, Chavis, Sr., Byrd, Hicks and Henson concluded the meeting by stating that plaintiff Towns' membership application continued in suspension.

226) Plaintiff believes that said defendants Fraley, Chavis, Sr., Byrd, Hicks and Henson acted in their official capacities on behalf of defendant Cornerstone during this meeting.

227) Shortly after this meeting, defendant Aker called an abrupt Cornerstone meeting at the end of a December 2012 Sunday Cornerstone service.

228) The subject matter of the said improvised "Special Meeting" was plaintiff Towns.

229) Said defendant Aker explicitly stated that plaintiff Towns had no right to membership in defendant Cornerstone until and unless he repented for unspecified actions.

230) During said defendant Aker's, outcry, he insisted that that no one would or could remove him from his pastoral position.

231) Defendant Aker specifically asserted that said that plaintiff Towns would be granted permission to continue to attend Cornerstone services at the defendant Cornerstone.

232) Therefore, plaintiff Towns continued to attend services and functions at the defendant Cornerstone's facilities in 2013.  Plaintiff Towns also continued his active participation in Sunday School and Mrs. Eartha Washington continued to

select plaintiff as a periodic presenter at Sunday School worship services through and including October 6th, 2013.

233) Defendant Cornerstone made it clear that plaintiff was not going to be a member.  However, the Cornerstone defendant had taken no action to impede, impair and/or otherwise deprive plaintiff Towns of his right to freely worship at defendant Cornerstone's church facilities.

234)  As plaintiff Towns' membership was no longer a viable issue, Rev. Davis, Mr. Braxton, Mr. Denson and plaintiff Towns agreed to pursue the outstanding financial issue of the Cornerstone defendants' failure to perform annual audits of defendant Cornerstone's books, records and/or finances.

235)  That is, said Rev. Davis, Messrs. Reuben Braxton, Bennie Denson, and plaintiff Towns initiated plans to have the defendant Cornerstone, its officers and officials comply with Article XII, of the Cornerstone's bylaws.

236)  However, this plan failed.

237) Yet, it is vital for this Court to know that financial gifts and offerings by defendant Cornerstone's members, friends, visitors and/or guests are part of the worship process at defendant Cornerstone.

238) That is, defendant Cornerstone's officers and/or spokespersons urged members, friends, visitors and/or guests to give a tenth of their income, from

whatever source, back to God as a tithe. Said members, friends, visitors and/or guests are admonished by defendant Aker and other officials that no one should rob God but that He has been robbed because God's people had failed to give Him a tenth of their income. That is, had failed to give a tithe to defendant Cornerstone.

239) Cornerstone defendants would regularly reference Malachi 3:8, while making their plea. (Old Testament, Malachi Ch. 3, Vs. 8)

240) The defendant Cornerstone's ministerial staff and officers would also urge members, friends, visitors and/or guests to give offerings over and above the "tithe" as an additional demonstration of their appreciation for what God has done for them. *Id*

241) Cornerstone defendants employed these exhortations to urge persons to give "as unto the Lord," in an effort to persuade people that their monies are not being given to mere humans but to God.

242) Plaintiff Towns has had the firm conviction that these spiritual exhortations translate the financial donation procedure into one of a religious order and, thus, places a duty upon Cornerstone defendants' to inform those who have given precisely what has been done with "God's money."

243) Hence, the by-laws are not merely a dictate for an accounting for the benefit of maintaining credibility with governmental officials, such as the Attorney General Eric Schneiderman, but also with God and the people of God.

244) Plaintiff Towns' participation in the effort to obtain such a full accounting was therefore an exercise of his protected religious and other first amendment rights.

245) To that end Rev. Davis, Mr. Reuben Braxton, Mr. Bennie Denson and plaintiff Towns agreed that Rev. Davis would appear at the January 2013 semiannual defendant Cornerstone business meeting for the purpose of making a formal motion that directed the defendant Cornerstone's officers, specifically, the defendant Cornerstone's Board of Trustees, to immediately retain a certified public accountant to conduct an audit of said defendant Cornerstone's financial records, accounts and/or books.

246) Rev. Davis, Braxton, Denson and Towns further agreed that they would issue an email to various Cornerstone members apprising them of the intended motion to have an accounting of the books and records of defendant Cornerstone.

247) Plaintiff Towns undertook the responsibility of preparing the email that was entitled "Crisis at Cornerstone."

248)  Upon receiving the approval of Rev. Davis, Braxton and Denson, plaintiff Towns circulated the email to members of the defendant Cornerstone via email.

249)  The Cornerstone defendants thwarted the intended motion by subjecting Rev. Davis to ridicule for her AIDS work at defendant Cornerstone, though this had nothing to do with said Cornerstone's business meeting.

250) These accusers made scurrilous denunciations against Rev. Davis solely to embarrass and intimidate said Rev. Davis so that she would refrain from making the intended motion.

251) On this occasion, the massive bullying effort succeeded.

252) However, it is noteworthy that plaintiff Towns continued his participation in Mrs. Eartha Washington's Sunday School class and attended regular Cornerstone services of defendant Cornerstone uninterrupted and without incident.

253)  To wit, plaintiff Towns received no written, oral or communications by any other means that stated and/or indicated any dissatisfaction with said plaintiff or plaintiff's attendance, appearance or participation in services at said defendant Cornerstone from the Cornerstone defendants, or any other source for the period commencing January 1st, 2013 through and including September 28th, 2013.

254) That on or about Sunday, September 8th, 2013, Mrs. Eartha Washington selected plaintiff Towns to make a presentation on the topic, "We Are Connected," at the September 29th, 2013, morning Sunday School worship service. (The topic is a reference to the *New Testament's* record of a portion of the Apostle Paul letter to the Romans. Romans 12: vs. 4-5) Upon information and belief, the said topic was selected by defendant Webb in her capacity as Superintendent of defendant Cornerstone's Sunday School.

255) Mrs. Eartha Washington unambiguously tasked plaintiff Towns with the responsibility of rendering the aforementioned religious proclamation.

256) That on or about Sunday, September 29th, 2013, said plaintiff Towns was duly recognized and called to speak on said topic, "We Are Connected" by defendant Deacon Hicks.

257) Ergo, in due course, said plaintiff rendered his oral protest and religious proclamation, which took the defendant Cornerstone's administration to task concerning the tasteless, summary firing of the defendant Cornerstone's administrator, Mrs. Beatrice Walls, after more than 49 years of service.

258)  Specifically, plaintiff Towns stated, in sum and substance:

> The Holy Spirit of God uses the Apostle Paul to emphasize, to awaken us to a spiritual truth that should never be forgotten ... WE ARE MUTUALLY DEPENDENT ON ONE ANOTHER.

That means that if one of us seeks the destruction of another who is a member of the Body of Christ at Cornerstone Baptist Church he or she is visiting destruction upon ALL OF US.

It is with this truth that I take this moment of spiritual time to look at THE BUTLER.

OUR BUTLER was a servant of God at Cornerstone Baptist Church for more than 49 years.

OUR BUTLER ministered to the family of God in the Church of God from the Choir Loft behind me for at least five decades.

OUR BUTLER, [*sic*, is the one] who served Dr. Sandy F. Ray, Interim Pastor, Rev. Henry Graham Scott, former pastor, Dr. Harry Starks Wright and the current pastor, until recently, Rev. Lawrence E. Aker, III.

Mrs. Beatrice Walls has been THE BUTLER of Cornerstone Baptist Church for almost 50 years.

OUR BUTLER was a servant of God who is due honor.

And a gift from God who is entitled to great rewards from this church.

But she and her sister have received no honor, have been given no rewards.

Mrs. Beatrice Walls could have taken her multiple Godly gifts into the world and earned millions with the voice of the sweet, serenading song bird but chose to stay in this church and labored in this vineyard even after good times turned to sour grapes.
Mrs. Beatrice Walls endured only to be turned out and put out from her beloved position as the Church's administrator with no more than a good-bye.

But, Mrs. Walls has connections with each of you through Jesus that will never end, BECAUSE WE ARE MUTUALLY DEPENDENT ON ONE ANOTHER.

And there is no question that Jesus will hold each of you accountable for how you now respond to the way that Mrs. Beatrice Walls and her sister have been treated and the pain they now suffer.

55

The only question for each of you on this Lord's day is will you allow such disgrace and dishonor to continue?

259) Having failed in their concerted efforts to shut plaintiff Towns up or run him out of defendant Cornerstone the defendants Webb, Fraley, Byron Howell and certain other Cornerstone defendants and/or defendants Ron Saes 1-15 and/or Rachael Roes 1-15, brazenly resorted to malevolent, spiteful and/or unlawful and/or illegal conduct.

260) Upon information and belief, the defendants Webb, Fraley, Byron Howell and certain other Cornerstone defendants and/or defendants Ron Saes 1-15 and/or Rachael Roes 1-15immediately began to conspire against plaintiff Towns for exercising his religious beliefs, worshiping in the manner that he had chosen and/or for utilizing his free speech right of expression and/or associating with whom he had chosen and/or speaking in the manner he had chosen, and/or freely exercising his right to enjoy interstate travel, to wit, traveling from his home in New Jersey to Bedford-Stuyvesant, Brooklyn, New York, and/or for exercising other constitutional and/or civil rights; and for demanding accountability of the defendant Aker, members of the Board of Deacons of defendant Cornerstone, jointly and/or severally, and members of the Board of Trustees of defendant Cornerstone, jointly and/or severally, accountable as pertained to their individual and/or respective duties, administration of finances and/or management of defendant Cornerstone and/or retaliating against plaintiff Towns for making the

aforesaid oral religious protest proclamation on the morning of Sunday, September 29th, 2013.

261) Likewise, having failed in the aforesaid efforts to run plaintiff Towns off or shut plaintiff Towns up said Cornerstone defendants did implement a campaign to forever "chill" plaintiff Towns from ever taking steps to exercise the aforesaid precious liberties.

262) To wit, said defendants Webb, Fraley, Byron Howell and/or certain other defendants and/or persons unknown to plaintiff Towns at this time, took the occasion of plaintiff Towns' September 29th, 2013, religious protest-proclamation to attack plaintiff Towns and/or to retaliate against plaintiff Towns and/or deprive him from exercising his constitutional, statutory and/or civil rights and/or for making the oral religious proclamation on the morning of Sunday, September 29th, 2013, as heretofore stated in ¶¶256-258, Pgs. 55-56, *supra.*

263) Upon information and belief, said defendants Webb, Fraley and Byron Howell, and /or certain other defendants and/or persons unknown to Towns were each acting in their respective official capacities and/or individual capacities.

264) Specifically, shortly after rendering the requested religious proclamation of September 29th, 2013, plaintiff Towns was subjected to public disparagement, ridicule, scorn and/or derision by defendants Webb, Fraley and Byron Howell, all

of whom were advancing the conspiracy to retaliate against said plaintiff Towns for exercising his said constitutional, statutory and/or civil rights.

265) Defendant Webb, believed to be acting in her official capacity as Superintendent of defendant Cornerstone's Sunday School, personally delivered the public mocking of plaintiff Towns in Mrs. Eartha Washington's Sunday School class while Cornerstone members and officials were present.

266) There were at least five (5) class members present at the time of defendant Webb's outburst against plaintiff Towns.

267) Said defendant Webb rendered this public thrashing of plaintiff Towns while flanked by said defendants Fraley and Byron Howell.

268) Unmistakably, defendant Webb's words were harbingers of the Terror Threat to come and that the Cornerstone defendants issued on October 10th, 2013.

269) For defendant Webb not only rebuked plaintiff Towns for his religious protest-proclamation but she specifically vowed that plaintiff never would speak such words again at defendant Cornerstone. Specifically, as recorded in Mrs. Eartha Washington's Affidavit of March 10th, 2015, defendant Webb exclaimed, "I will never allow this again on my watch." ¶27, Pg. 6. (A true and complete copy of said affidavit is annexed hereto and designated *Exhibit H*)

270) Upon information and belief, the defendant Aker did soon join in and/or took leadership over the conspiracy to retaliate against said plaintiff Towns for exercising his constitutional, statutory and/or civil rights, including but not limited to plaintiff Towns religious beliefs and/or for making the oral proclamation on the morning of Sunday, September 29th, 2013, as more fully stated in ¶¶ 256-258, Pgs. 55-56, , *supra.*

271) Furthermore, upon information and belief, defendant Aker did seek to continue and advance the efforts and/or did continue and/or advance the conspiracy to deprive, extirpate, threaten, impede, impair, and/or otherwise deprive the plaintiff Towns of his aforesaid constitutional, statutory and/or civil rights.

272) Moreover, upon information and belief, said defendant Aker did join with said defendants Webb, Fraley and Byron Howell, in retaliation for plaintiff Towns' September 29th, 2013, oral religious protest proclamation.

273) In addition thereto, and upon information and belief, the said defendant Aker did garner the additional support, aid, succor and/or collaboration of the defendants Chavis, Sr., chairman of the Deacon Board of defendant Cornerstone, Byrd, Vice-chairman of the Deacon Board of defendant Cornerstone, Henson, and certain other Cornerstone defendants and/or defendants Ron Saes 1-15 and/or Rachael Roes 1-15.

274)  Upon information and belief, defendants Webb, Fraley and Byron Howell joined with defendants Chavis, Sr., and/or Byrd and did continue as collaborators, facilitators and/or co-conspirators with said defendants Aker and Henson and/or other persons and/or defendants unknown to the plaintiff at this time.

275) Upon information and belief, the defendants, Aker, Fraley, Chavis, Sr., Byrd, Henson, Byron Howell and certain other defendants and/or persons unknown to Towns  at this time, immediately began to conspire against plaintiff Towns to retaliate against said plaintiff Towns for exercising his constitutional, statutory and/or civil rights, including but not limited to plaintiff Towns religious beliefs and/or for making the oral proclamation on the morning of Sunday, September 29th, 2013, as more fully stated in ¶ 259, Pgs. 56-57, *supra.*

276) Remaining discontented with the malevolent, spiteful and/or unlawful and/or illegal acts and/or deeds already perpetrated against plaintiff Towns, upon information and belief defendants Aker, Fraley, Chavis, Sr., Byrd, Henson, Howell and/or Ron Soes 1-15 and Rachael Roes 1-15 and/or other persons and/or defendants unknown to the plaintiff at this time, did solicit, petition, importune and/or  beseech officers and/or officials of the defendant New York City Police Department, John Does 1-15 and/or Jane Roes 1-15 defendant Hynes in his personal and/or official capacity, and/or officials and/or persons Sam Soes 1-10 and/or Sadie Coes 1-10 in the District Attorney's Office to join said Cornerstone defendants' in their conspiratorial endeavor to extirpate, threaten, impede,

impair, and/or otherwise deprive the plaintiff Towns of his aforesaid constitutional and/or civil rights as hereinabove particularized in paragraphs 184, Pg. 41; 260-261, Pg. 57-58, *supra.*

277) To wit, said defendants Aker, Fraley, Chavis, Sr., Byrd, Henson, Byron Howell and/or other defendants and/or Ron Soes 1-15 and Rachael Roes 1-15, did jointly and/or severally communicate with officers and/or officials of the defendant NYPD including but not limited to John Does 1-15 and/or Jane Roes 1-15, and/or defendant Hynes and/or Sam Soes 1-10 and/or Sadie Coes 1-10 in their respective personal and/or official capacities, and did knowingly, intentionally, recklessly, wantonly and/or negligently provide information and/or allegations of fact concerning said plaintiff Towns  known to them to be wholly fabricated, baseless,  and/or false, and/or that they should well have known to be wholly fabricated, baseless,  and/or false, and/or with reasonable effort would have been made known to have been wholly fabricated, baseless,  and/or false.

278) Upon information and belief, said communications with officers and/or officials of the New York City Police Department, former District Attorney Charles Hynes in his personal and/or official capacity, and/or officials in the District Attorney's Office were for the purpose of obtaining official state action and/or sanction to threaten, intimidate, bully, terrorize and/or prompt alarm in plaintiff Towns that he would be arrested, detained, harassed, arrested and/or otherwise subjected to stated created threats and/or otherwise subjected to legal and/or

unlawful physical threat of harm and/or subject to actual use of force, whether lethal, legal or otherwise, and/or other state authorized official sanction if he should enter into or approach the premises of the defendant Cornerstone.

279) In effect, plaintiff believes said Cornerstone defendants did obtain, was provided "input" and/or extended "cooperation" by officers and/or officials of the defendant NYPD John Does 1-15 and/or Jane Roes 1-15, defendant Hynes in his personal and/or official capacity, and/or officials and/or persons Sam Soes 1-10 and/or Sadie Coes 1-10 in the District Attorney's Office and said defendants performed acts, did deeds and/or gave assurances to the Cornerstone defendants that emboldened said Cornerstone defendants to issue the October 10th, 2013 Terror Threat hereinafter described.

280) Moreover, upon information and belief, said defendant NYPD mobilized to implement the use of physical force, whether lethal and/or otherwise, against plaintiff Towns to effectuate the planned intervention, detainment, harassment, arrest and/or subjecting plaintiff to state created threats on October 13th, 2013 and/or on October 20th, 2013.

281) Upon information and belief, said defendants Aker, Fraley, Chavis, Sr., Byrd, Henson, Howell and/or defendants and/or other persons unknown to the plaintiff Towns at this time, made these knowingly baseless, false, disparaging statements to attain an alliance with said defendant NYPD John Does 1-15 and/or

Jane Roes 1-15, to appear at the site of defendant Cornerstone on October 13th, 2013 and/or on October 20th, 2013, to execute legal sanction and/or power against the innocent plaintiff Towns as heretofore recited.

282) In furtherance of their criminal conspiracy and/or enterprise, said Cornerstone defendants did mail a written Terror Threat to plaintiff Towns, utilizing the United States Postal Service. To wit, the October 10, 2013 Terror Threat was directly addressed to plaintiff Towns.

283) The same was dated October 10th, 2013, just eleven (11) days after plaintiff Towns' September 29th, 2013, religious protest-proclamation.

284) That on or about the 12th day of October 2013, plaintiff Towns received said letter signed by defendants Chavis, Sr., and Byrd, in their respective capacities as Chair and Co-chair of the defendant Cornerstone's Deacon Board.

285) This draconian document is believed to have been issued and/or sent at the instruction, instance, demand and/or request of defendants Aker, Fraley, Chavis, Sr., Chavis, Jr., Byrd, Henson, Byron Howell, Henson, Webb, Hicks, Swann, Wood, Lane, Spellman, Amaziah Howell, Coston, Cox, Price and/or other persons unknown to the plaintiff at this time, and/or on behalf of said defendant Cornerstone.

286) Moreover, in March 2014, defendant, Chavis, Sr., did inform Rev. Claudette Davis that the October 10th, 2013Terror Threat was presented to defendant members of the Board of Deacons by defendant Aker.

287) Defendant Chavis, Sr., further informed Rev. Davis that the defendant Cornerstone's Deacon Board members debated the Terror Threat of October 10th, 2013, and that said defendant Chavis, Sr., stated he did not want to sign the said Terror Threat.  However, defendant Chavis, Sr., felt compelled to sign it because defendant deacons insisted "something had to be done" and the aforesaid illegal conspiracy and Terror Threat of October 10th, 2013, was the "something" chosen.

288) Thus, under the foregoing circumstances defendant Chavis, Sr., said he signed the Terror Threat in his capacity as Chairman of the Deacon Board of defendant Cornerstone.[7]

289) Said October 10th, 2013Terror Threat, speaks for itself.

---

[7]     The Court is advised that defendant Chavis, Sr., did not describe the said October 10th, 2013 document as a "Terror Threat" but as said letter directly falls within this Circuits definition of a written threat it sufficiently establishes a prima facie case against all defendants sued herein.

Moreover, though §240.30(1) (Aggravated Harassment), has been declared unconstitutional the defendants' acts violate New York State *Penal Code* §240.25 and, thus, said state's *Hate Crime Laws,* to wit, Penal Code §485.05. Additionally, said Cornerstone defendants' ongoing, persistent and unremitting arrest threat specifically constitutes ongoing and/or continued acts to terrorize plaintiff Towns in an effort to keep him from entering upon defendant Cornerstone's public properties and, as a direct consequence, exercising his constitutional, statutory and/or civil rights as herein set forth.  See, New York *Civil Rights Law* §40-c(2)

Moreover, it is hard to conceive of more "chilling" steps to coerce a person from protesting via speech than threatening them with physical force and/or deadly lethal force exercised by defendants NYPD and John Doe 1-15 and/or Jane Roe 1-15.

Effective immediately, you do not have permission or authority to enter the Cornerstone Baptist Church or its locations for any reason.

This decision has been considered and approved by the Cornerstone Baptist Church Board of Deacons, with cooperation and input from the Kings County District Attorney's Office and the 81st Precinct.

If (*sic*) in fact, you enter any part of the church or its locations in the future (*sic*) for any reason, you will be arrested for Trespass. (See, *Exhibit A*)

290) The aforesaid October 10, 2013 Terror Threat's wording that the Cornerstone defendants have received "cooperation and input" from the Kings County District Attorney's Office and the 81st Precinct is highly significant.

291) The words "cooperation and input" are used in the said Terror Threat as conjunctive.

292) They inform the reader that the Kings County District Attorney's Office and the 81st Precinct have cooperated with Cornerstone defendants in their effort to preclude plaintiff Towns from entering any portion of defendant Cornerstone's properties.

293) Likewise, the October 10th, 2013 Terror Threat makes plain said Cornerstone defendants have received "input" into precisely how they might successfully achieve their pernicious end; and/or additionally that said District Attorney's Office and the 81st Precinct would cooperate in effecting the achieving of said despicable goal.

65

294) Thus, the intended recipient of the October 10th, 2013 Terror Threat had every reason to believe that the Cornerstone defendants had obtained an active alliance with the Kings County District Attorney's Office and the 81st Precinct to effectively deny, extirpate, threaten, impede, impair, and/or otherwise deprive the plaintiff Towns of his constitutional, statutory and/or civil rights by and/or including the use of lethal force, as more specifically set forth *supra*, at ¶ 184, Pg. 41; ¶¶260-261, Pg. 57-58,.

295) Moreover, said October 10th, 2013 Terror Threat document conclusively establishes said Cornerstone defendants specifically sought to retaliate against plaintiff Towns for exercising his aforesaid constitutional, statutory and/or civil rights, as heretofore described.

296) In addition thereto, said October 10th, 2013 Terror Threat absolutely establishes that said Cornerstone defendants and/or defendants Ron Saes 1-15 and/or Rachael Roes 1-15, intended to extirpate, threaten, impede, impair, and/or otherwise deprive the plaintiff Towns of his aforesaid constitutional and/or civil rights as more specifically hereinabove set forth.

297) Said October 10th, 2013 Terror Threat further established that said Cornerstone defendants and/or other defendants Ron Saes 1-15 and/or Rachael Roe 1-15 acts were premeditated; said defendants acted wilfully, knowingly, recklessly and/or wantonly and/or in complete disregard to the consequences that

might befall and/or effect said plaintiff Towns and other innocent persons, in their blind quest to extirpate, threaten, impede, impair, and/or otherwise deprive the plaintiff Towns' aforesaid constitutional, statutory and/or civil rights as more specifically heretofore set forth.

298) Thus, the Cornerstone defendants and/or other persons and/or defendants unknown to the plaintiff at this time, intended and/or purposed to have plaintiff Towns arrested, seized, threatened, subjected to physical harm and/or harassed by said police officials in their ongoing criminal conspiracy and/or enterprise to deprive, extirpate, threaten, impede and/or otherwise impair plaintiff Towns' aforesaid constitutional, statutory and/or civil rights, including but not limited to his religious beliefs and/or to retaliate against said plaintiff Towns for his prior implementation of said rights as more particularized in ¶ 184, Pg. 41; ¶¶ 260-261, Pgs. 57-58.

299) Additionally, said Cornerstone defendants placed plaintiff Towns and/or other persons in and or about defendant Cornerstone's facilities at substantial risk of serious physical injury by obtaining police presence on or about October 13th, 2013, and/or October 20th, 2013.

300) As a direct and proximate result of Cornerstone defendants' and Cornerstone s' stated acts plaintiff Towns suffered grievous injury.

## INTRODUCTORY FACTS CONCERNING NYPD

301) The defendant NYPD's intentional, willful, and/or knowing violations of minority groups' fundamental constitutional, statutory and/or civil rights has a long and tortured historical precedence.

302) The persistent and protracted established pattern of the defendant NYPD's conduct, over multiple decades, of violating the fundamental constitutional rights of minorities and/or persons of color in the defendant City of New York, created a pernicious and/or toxic environment in which the current violations of plaintiff Towns' said fundamental constitutional, statutory and/or civil rights were free to occur.

303) In fact, from the high portals of the top echelons of defendant NYPD, the *Towns incident* is no more than an inconsequential blip.

304) Yet, the defendants Michael R. Bloomberg, as Mayor, and Raymond W. Kelly, as Police Commissioner, each acting in their official and/or individual capacity, were the principal catalytic agents wilfully, knowingly, recklessly and/or without regard for their respective legal obligations to protect persons in the defendant City's territorial jurisdiction from state created threats, whether explicit or implicit, actions and/or inactions that emboldened private citizens and/or municipal employees to injure the public, in particular, the minority residents and/or visitors; additionally, failing to take steps and/or implementing

procedures that minimized risks of state created threats and/or actions that emboldened both municipal employees and/or private citizens to injure others and/or to prevent employees of defendant City from assisting in creating and/or increasing the danger to innocent persons.

305) Moreover, said defendants Bloomberg and Kelly were each under constitutional and/or statutory mandate to take steps and/or implement procedures that provided means by which their appointed and/or employed personnel,  and/or supervisors would be able to accurately ascertain, coordinate and have notice of defects, omissions, oversights, failings and/or other information required to protect persons within defendant City's jurisdiction from state created threats and/or actions that emboldened municipal employees and/or private citizens to injure others and/or to prevent employees of defendant City from assisting in creating and/or increasing the danger to innocent persons. Yet, notwithstanding such constitutional and/or statutory mandate said defendants Bloomberg and Kelly evidenced persistent disdain and/or contempt and/or complete disregard for such obligations.

306) In addition thereto and upon information and belief, said defendants Bloomberg and/or Kelly were responsible for establishing and/or maintaining such policies and procedures as were required to effectuate the hereinabove responsibilities. Yet, even after protracted notice and/or information that the defendant NYPD was consistently violating the constitutional, statutory and/or

civil rights of its minority citizenry and/or visitors, defendants Bloomberg and Kelly, consistently failed to act, even as disaster after disaster and complaint after complaint made known to them the deteriorating circumstances and/or conditions that persons of color and minorities were being subjected to; thus, otherwise innocent persons were repeatedly victimized by unlawful and/or illegal force, intimidation and/or harassment, deadly lethal force, bodily intrusions, emotional intrusions and/or verbal threat and/or otherwise victimized by unconstitutional state action for years; yet said defendants Bloomberg and/or Kelly only evidenced disdain, contempt and/or complete disregard for their respective obligation to protect innocent persons and did nothing more than pay lip service to their respective constitutional and/or statutory obligations.

307) Upon information and belief, had said defendants Bloomberg and/or Kelly intervened to end the lengthy illegal, pernicious and/or ongoing unconstitutional conduct that persisted during their respective tenure, the herein described sinister acts against plaintiff would likely not have occurred. For plaintiff Towns would have been viewed as having the same precious liberties and rights as persons in midtown Manhattan and not as a being to whom defendant NYPD owed no constitutional and/or statutory duty.

308) Thus, with an almost certain confidence that any conduct defendants NYPD and John Does 1-15 and/or Jane Roes 1-15 committed against plaintiff Towns would go completely without investigation, discipline and/or punishment,

said John Does 1-15 and/or Jane Roes 1-15 of defendant NYPD, felt free to extirpate the fundamental rights of plaintiff Towns, as hereinabove set forth.

309) In addition, said defendant NYPD and/or its employees and/or police officers and/or supervisory officials felt equally free to take any and all steps necessary to abrogate the right of plaintiff Towns to due process of law, access to the courts for determination of any wrongdoing and/or criminal activity prior to being sanctioned, potentially subjected to intervention, detainment, harassment, arrest and/or other stated created threat and/or being deprived of his liberty, being subjected to police force, whether lethal or otherwise, threatened with bodily injury, emotional and/or physical harm and/or restraint or otherwise from freely exercising his fundamental constitutional, statutory and/or civil rights set forth herein.

310) Thus, said defendants NYPD and the City of New York, together with, John Doe 1-15 and/or Jane Roe 1-15 defendants, currently unknown to plaintiff Towns, did appear at the defendant Cornerstone, on Sunday, October 13th, 2013, and again on Sunday, October 20th, 2013, for the purpose of subjecting plaintiff Towns to intervention, detainment, harassment, arrest and/or other stated created threat and/or being deprived of his liberty, being subjected to police force, whether lethal or otherwise, threatened with bodily injury, emotional and/or physical harm and/or restraint or otherwise from freely exercising his fundamental constitutional, statutory and/or civil rights set forth herein.

311) These conclusions are derived from and/or supported by a number of sources: To wit, *Floyd vs. NYPD*, 959 F. Supp.2d 540 (S.D.N.Y. 2013), J. Scheindlin; NY Atty General Stop & Frisk Analysis, cited on line at,

http://www.ag.ny.gov/pdfs/OAG_REPORT_ON_SQF_PRACTICES_NOV_201

3.pdf; defendant, NYPD, *Patrol Guide*; The Civilian Community Board, *A Mutated Rule: Lack of Enforcement is the Face of Persistent Chokehold Complaints in New York City*, cited online at

http://www.nyc.gov/html/ccrb/downloads/pdf/Chokehold%20Study20141007.pdf. *Off Duty, Black Cops In New York Feel Threat From Fellow Police*, cited online at
http://www.reuters.com/article/2014/12/23/us-usa-police-nypd-race-insight-idUSKBN0K11EV20141223;

Finally, the current Mayor, Mr. DeBlasio, candidly expressing the fear he and his wife shared for their own African-American son, stated:

> "I've had to worry over the years. Chirlane's had to worry. Is Dante safe each night? There are so many families in this city who feel that each and every night. Is my child safe?...*Are they safe from the very people they want to have faith in as their protectors?*" (Emphasis added) Cited online:

http://www.nydailynews.com/blogs/dailypolitics/de-blasio-raises-fears-son-dante-garner-decision-blog-entry-1.2032359

312) In the case *of Floyd vs. NYPD*, *Supra*., 959 F. Supp.2d 540 at 658, Judge Shira A. Scheindlin held:

> [That] the plaintiffs established the City's liability for the NYPD's violation of their Fourth Amendment rights under two theories, either of which is adequate under Monell: first, plaintiffs showed that senior officials in the City and at the NYPD were deliberately

indifferent to officers conducting unconstitutional stops and frisks; and second, plaintiffs showed that practices resulting in unconstitutional stops and frisks were sufficiently widespread that they had the force of law.

313) This lawsuit involves a more serious constitutional intrusion, to wit, the premeditated, intentional, knowing and/or wilful John Does 1-15 and/or Jane Roes 1-15 attempt to effect the intervention, detainment, harassment, arrest and/or other stated created threat and/or being deprive plaintiff Towns of his liberty, being subjected to police force, whether lethal or otherwise, threatened with bodily injury, emotional and/or physical harm and/or restraint or otherwise from freely exercising his fundamental constitutional, statutory and/or civil rights set forth herein.

314)

315) Judge Scheindlin's factual conclusions provide the predicate for the claims made herein and/or absolutely establish that defendant, NYPD's, senior officials of defendant, City of New York, including but not limited to former Mayor, defendant Bloomberg, and former defendant NYPD Police Commissioner, defendant Kelly were deliberately indifferent to officers conducting unconstitutional stops and frisks; and it was also established that practices

resulting in unconstitutional stops and frisks were sufficiently widespread that they had the force of law. *Id* [8]

316)  The Floyd Opinion of Judge Scheindlin decrees that,

> The NYPD's senior officials have violated section 1983 through their deliberate indifference to unconstitutional stops, frisks, and searches. They have received both actual and constructive notice since at least 1999 of widespread Fourth Amendment violations occurring as a result of the NYPD's stop and frisk practices. Despite this notice, they deliberately maintained and even escalated policies and practices that predictably resulted in even more widespread Fourth Amendment violations. *Id*, 959 F. Supp.2d 658-659

At 959 F. Supp.2d 557, Judge Scheindlin's emphatically acknowledged,

> ... It is important to recognize the human toll of unconstitutional stops. While it is true that any one stop is a limited intrusion in duration and deprivation of liberty, each stop is also a demeaning and humiliating experience. No one should live in fear of being stopped whenever he leaves his home to go about the activities of daily life.[9] Those who are routinely subjected to stops are overwhelmingly people of color, and they are justifiably troubled to be singled out when many of them have done nothing to attract the unwanted attention. *Id*, 959 F. Supp.2d 557 (Footnote omitted)

---

[8]     Consequently, having been permitted and/or encouraged to violate the constitutional rights of minorities and people of color within the defendant city of New York for multiple decades, the more degrading acts set forth herein were clearly of no moment to the municipal defendants.

[9]     Plaintiff Towns lived, not only with a definite apprehension of being illegally stopped, detained, harassed but he also lived with the very genuine existential threat that he might be arrested, whether on the street or in his home in New Jersey, and defendant NYPD, with the aid of others, had the option to resort to force to effect a wholly illegal arrest.

Plaintiff was an innocent victim, vulnerable to any level of force the defendant NYPD might elect to employ.

Plaintiff lived under this existential cloud until October 29th, 2013, when, upon venturing to go forth to the defendant, District Attorney's Office of Kings County, he was apprised by an official of defendant District Attorney of Kings County, Mr. Anthony Barosy that no charges were pending against him.

317) Judge Scheindlin draws upon the 1996 Ninth Circuit opinion that informs.

"...These stops are humiliating, damaging to the detainees' self-esteem, and reinforce the reality that racism and intolerance are for many African-Americans a regular part of their daily lives." [Footnote Omitted] *Id*, 959 F. Supp.2d 602-603

318) Judge Scheindlin's 198-page opinion made the following critical findings of facts with respect to the defendant NYPD's record and/or history of consistently violating the due process and/or equal protection rights of minority groups within the city of New York:

319) Judge Scheindlin summarized her determination that the defendant NYPD's historical record established defendant NYPD's pattern of consistently violating the rights of minorities and/or persons of color as follows: "In short, I find that the "'institutional evidence'" — evidence regarding the actions or inactions of the NYPD — shows that the City has been deliberately indifferent to violations of the plaintiff class's Fourth and Fourteenth Amendment rights." *Id*, 959 F. Supp.2d 590

320)   The opinion established the climate, environment or in the more precise words of Monell, the incorporated policy and custom of the defendant NYPD, to wit, its "deliberate indifference" to its officers' egregious conduct: *Id*, 959 F. Supp.2d 593

321) Moreover, these acts persisted for more than a decade and though defendant NYPD had notice of these violations, they increased between 2002 and 2011. *Id* Judge Scheindlin held that,

> "*The evidence showed that the NYPD turned a blind eye to its duty to monitor and supervise the constitutionality of the stops and frisks conducted by its officers.*" (Emphasis Added) *Id.*

322) There is an abundance of evidence upon which Judge Scheindlin reaches the following factual conclusion,

> The foregoing evidence shows that officers are routinely subjected to significant pressure to increase their stop numbers, without corresponding pressure to ensure that stops are constitutionally justified. Together with evidence described in the next section, this is a predictable formula for producing unjustified stops. *Id,* 959 F. Supp.2d 602

323) Judge Scheindlin additionally concluded that the record showed and evidence substantiated the *Floyd* plaintiffs' claims that though the defendant NYPD had been aware of the fact that there were systematic failures by officers to record the justifications for stops in their memo books it did nothing and ignored this procedural violation. *Id,* 959 F. Supp.2d 608

324) These findings, among others, led to Judge Scheindlin's declaration that there were fatal defects in the defendant NYPD's training documents and/or procedures. *Id.,* 959 F. Supp.2d 614-618

325) Added to this troubling mix were two (2) additional findings, that is, inadequate discipline, *Id.*, 959 F. Supp.2d 617-620 and ignoring ongoing notice of constitutional violations. *Id.*, 959 F. Supp.2d 620-624 Thus, the lack of discipline and/or protracted disregard of constitutional violations afforded defendant NYPD's employees a license for further and/or more aggressive unconstitutional and/or illegal conduct.

326) On July 30th, 2014, the Hon. Analisa Torres ended the Floyd litigation. *Floyd v. City of New York*, (S.D.N.Y., July 30, 2014); aff'd., 2d Cir., Aug. 2014.

327) Thus, the Floyd case was fully litigated to conclusion before the Hon. J. Scheindlin and her findings of fact and conclusions of law are binding upon the municipal defendants before this Court as to the Monell question set forth herein.

328) Accordingly, plaintiff respectfully demands that this court take judicial notice of the factual determinations made by Judge Scheindlin and her scholarly elucidation of the law as set forth in the aforesaid *Floyd* opinion. Moreover, plaintiff Towns also asks the Court to take judicial notice of Judge Scheindlin's penultimate holding:

> Plaintiffs established the City's liability for the NYPD's violation of their Fourth Amendment rights under two theories, either of which is adequate under Monell: first, plaintiffs showed that senior officials in the City and at the NYPD were deliberately indifferent to officers conducting unconstitutional stops and frisks; and second, plaintiffs showed that practices resulting in unconstitutional stops and frisks

were sufficiently widespread that they had the force of law. *Id.*, 959 F. Supp.2d 658

329) The foregoing further implicates the within defendants Bloomberg and/or Kelly.

330) The pattern of defendants City, NYPD, Bloomberg and/or Kelly's deliberate indifference to officers unconstitutional conduct and that practices were sufficiently widespread that they had the force of law is further established in the *New York Attorney General's November 2013 Stop and Frisk Analysis.*

> In 2012, Jeannette Rucker, the Chief of the Complaint Room and Arraignment Bureau in the Bronx District Attorney's Office, testified about her efforts to address the NYPD's practice of making unconstitutional stops outside certain private buildings.[23] Rucker testified that in 2010, in addition to receiving a "steady stream of complaints about trespass arrests" from the defense bar, she learned that judges were dismissing the cases and "finding evidence that the defendants lived in the buildings where the trespass was said to have occurred." (Footnote omitted) *Id.*, RPT at Pg. 21.

> 331) It was also reported that,

> In 2011, Rucker met with representatives of the NYPD and the other four district attorneys' offices to address the problem and issued memoranda to clarify the rules surrounding trespassing arrests. In a 2012 letter, Rucker informed the NYPD that she continued to receive similar complaints. As a result, she re-imposed the requirement that arresting officers be interviewed by the district attorney's office before the arraignment of trespass cases. (Footnotes omitted) *Id.*, RPT at Pg. 18

332) Finally, as to "Stop Question and Frisk" arrests the *Attorney General* Report established that "During each of the four years covered in this report, the

percentage of SQF arrests that the defendant NYPD voided or that led to a DP remained virtually unchanged." *Id*, RPT @ PG. 17-18

333) A contemptuous report from the defendant, NYPD's Civilian Complaint Review Board demonstrated the defendant NYPD's complete disregard for its own regulatory mandates, to wit, the NYPD Patrol Guide. *A Mutated Rule, Supra*. Pg. viii

334) The said report's executive summary informs:

> For more than 20 years, the NYPD Patrol Guide has prohibited the use of chokeholds, relying on a Police Department rule that unequivocally forbids any pressure to the neck, throat or windpipe that may inhibit breathing. This rule was plainly intended to prohibit all chokeholds. As defined, chokeholds, though not illegal, are unambiguously prohibited by Department policy.
>
> This report reveals that officers have continued to perform chokeholds and, based on the complaints the CCRB received from the public, the use of chokeholds appears to be increasing despite the Patrol Guide prohibition. It also reveals that this crystal clear prohibition has been degraded over the course of the last decade.[10]
>
> ............................................................
>
> Put simply, during the last decade, the NYPD disciplinary decisions in NYPD administrative trials of chokehold allegations failed to enforce the clear mandate of the Patrol Guide Chokehold rule. Id., Pg. viii

---

[10]     This singular "risk factor" sufficiently justifies plaintiff Towns' decision not to risk an intervention and/or confrontation with any defendant NYPD police personnel on October 13th, 2013 and/or on October 20th, 2013.

335) The foregoing definitively establishes that the defendants Bloomberg and Kelly permitted, if not fully and/or implicitly encouraged the defendant NYPD to consistently operate beyond the law and/or constitutional authority in communities where persons of color and/or minority persons resided.

336) Again, as was proclaimed by Lieutenant Delafuente's, defendant NYPD sought to "own the streets" of Bedford-Stuyvesant, Brooklyn and the persons who lived and/or visited that community were vested with no rights that any police officer was bound to respect. *Floyd, Supra*, 959 F. Supp. 2d 597. Furthermore, the defendant NYPD and/or its employees were granted expressed and/or implicit license to disregard its governing patrol manual, the NYPD Patrol Guide.

337) In addition thereto, this case is only a further example of the defendant NYPD's incessant unconstitutional conduct and/or re-emphasizes that illegal and/or unconstitutional acts were widespread throughout the defendant NYPD and were condoned if not encouraged by defendants Bloomberg and/or Kelly.

338) Furthermore, upon information and belief, the *NYPD Patrol Guide* is a police officer's fundamental rulebook.[11]

---

[11]   Plaintiff obtained what he believes is a true copy of defendant NYPD's Patrol Guide from an online source. However, the information contained therein may not be wholly accurate, complete or may be outdated.

Therefore, plaintiff will demand production of the current official NYPD Patrol Guide

339) Said Patrol Guide provides in depth instruction that every police officer is mandated to obey.

340) Patrol Guide, Procedure Section No: 207-01, "COMPLAINT REPORTING SYSTEM," at Page 1, defines a complaint as, "An allegation of an unlawful or improper act or omission, or other condition that necessitates investigation to determine if any unlawful act or omission occurred."

341) The Patrol Guide establishes the responsibility of defendant NYPD's officers when investigating potential unlawful, improper and/or other acts requiring investigation.

342) The following appears to detail the responsibilities of a defendant NYPD officer who is charged to conduct such an investigation.

343) Patrol Guide Complaints Procedure No: 207-07 directs that "When assigned to investigate a complaint he or she is to conduct a thorough investigation."

344) Of course, it is vital for a defendant NYPD officer to have a firm understanding of what constitutes a "Thorough" investigation; otherwise, the Patrol Guide serves no useful purpose.

345) Toward that end, *The Patrol Guide* dictates that the officer "shall interview complainant and witnesses, obtain facts and safeguard evidence." Complaints Procedure No: 207-07, *Id.*[12]

346) What else an assigned officer is required to do in his or her duties to conduct a "Thorough" investigation appears to be an open question, for the Patrol Guide seems to lack any further instructions. *Id*

347) However, a minimally "thorough" investigation would require the assigned officer seeks to identify the alleged perpetrator of the acts at issue. To wit, the person or persons involved or that brought questions of unlawful and/or improper actions and/or omissions to his or her attention.[13]

---

[12]    It is not disclosed in said Patrol Guide what guidance is given in conducting an "interview;" how does the prospective officer conduct the interview and what is said officer required to ascertain during the course of the interview are questions left unanswered?

[13]    Note is taken that, once the initial investigating officer has completed this "thorough" investigation he or she is required to complete a "Complaint Report Worksheet" that is required to be reviewed by the assigned Desk Officer. Complaints Procedure No: 207-07, *Id*, at Pg. 4.

The Desk Officer is then tasked with the responsibility of "Carefully examin[ing] Complaint Report Worksheet for accuracy and completeness. *Id.* at Pg. 5.

Upon his or her completion of the "careful examination" of the Complaint Report Worksheet for accuracy and completeness, the Desk Officer is directed to submit the "Complaint Report Worksheet" to the command clerk who is tasked with entering the information into the NYPD computer system network. *Id.*

Finally, the Commanding Officer is required to review the complaints.

At some point during this process a genuinely dutiful investigatory team would have inquired, "Well, who is the alleged suspect and has he been contacted?"

Additionally, what is the evidence that a crime or other unlawful act or omission had been committed that constitutionally warrants an arrest, would seem a reasonable inquiry?

348) Once the defendant NYPD had identified the alleged perpetrator, the officer ought to determine if there existed sufficient evidence to determine if a crime and/or improper conduct has been committed or other conduct requiring defendant NYPD intervention.

349) As it is evident that the events herein were not emergent for the defendant NYPD is believed not to have first appeared at defendant Cornerstone until October 13th, 2013, three (3) days after the execution of the October 10th, 2013 Terror Threat document. (Nor, does this include the unknown date when the Cornerstone defendants first contacted the defendant NYPD's 81st Precinct.)

350) Therefore, an officer conducting a genuinely "thorough" investigation would have reached out to plaintiff Towns to determine whether there was any validity to the allegations of the Cornerstone defendants.

351) Had plaintiff Towns been notified by the defendant NYPD that he was being investigated and/or that charges of criminality and/or of a criminal nature were made and/or levied against him he would have responded by providing the names and telephone numbers of persons who would have openly and freely addressed such allegations.

352) Plaintiff Towns would have advised the officer or officers that Mrs. Eartha Washington invited plaintiff to give a religious proclamation addressing a religious theme on Sunday, September 29th, 2013.

353) Likewise, plaintiff Towns would have summarized the events herein set forth.

354) Plaintiff Towns would have provided defendant NYPD's officer(s) with the telephone number of Mrs. Eartha Washington, Rev. Claudette Davis, Mr. Reuben Braxton and Mrs. Eva Dozier. Said persons would have provided said police personnel with a complete historical background as to plaintiff Towns' involvement with the defendant Cornerstone and the Cornerstone defendants, as has been set forth herein.

355) Upon information and belief, the defendant NYPD took no such steps because defendant NYPD never contacted plaintiff Towns. Moreover, as hereinafter set forth at Pages 79-83, ¶¶336-352 , herein, plaintiff believes defendant NYPD conducted no investigation, in whole or in part, because of the intervention and/or facilitation of defendant Hynes and/or other persons unknown to the plaintiff at this time.

356) Said defendant NYPD amplified these failings when it utilized the power of the state and appeared at the defendant Cornerstone's facilities, willing, ready and able to effect the threatened intervention, detainment, harassment, arrest and/or stated created threat of plaintiff Towns on October 13th, 2013, and again on October 20th, 2013.

357) That is, defendant NYPD appeared *en masse*, at defendant Cornerstone's physical location believed to have been bearing weapons. The foregoing establishes that their appearance on October 13th, 2013 and, again, on October 20th, 2013, was to subject plaintiff to state intervention, detainment, harassment, arrest and/or other stated created threat as set forth October 10th, 2013 Terror Threat.

358) Though defendant NYPD's October 13th, 2013 deployment said defendant NYPD had a seven-day window to conduct an investigation of the issues heretofore set forth; upon information and belief said defendant NYPD and/or John Does 1-15 and/or Jane Roes 1-15 did nothing.

359) Furthermore, plaintiff Towns did not receive any communication from the defendant NYPD between October 13, 2013 and October 20, 2013. Ergo, plaintiff is entitled to this Court's presumption that defendant NYPD conducted no investigation during that seven (7) day period.

360) Finally, the inevitable deduction is that the defendant NYPD's actions on October 13th, 2013 and on October 20th, 2013 were without any lawful basis, and were performed solely as a mechanism to deprive, extirpate, threaten, impede, impair, and/or otherwise deprive the plaintiff Towns of his constitutional, statutory and/or civil rights, as more particularly stated in ¶¶ 260-261, Pgs. 56-57, herein.

361) These acts are far more pernicious than in *Floyd,* because they were defendant NYPD's and John Does 1-15 and/or Jane Roes 1-15s' premeditated, intentional and/or calculated decisions made after time for deliberation and/or consultation.

362) Moreover, said defendant NYPD's acts were knowingly and/or wilfully effected to destroy personally held constitutional, statutory and/or civil rights of plaintiff Towns, including but not limited to personal religious beliefs and perpetrated with a racial animus that has pervaded the defendant NYPD's personnel and, more particularly, the officers and/or supervisory personnel at the 81st Precinct.

363) Additionally, the threat of intervention, detainment, harassment, arrest and/or other stated created threat was an intrusion upon plaintiff Towns' physical and/or emotional person.

364) Said acts herein stated were the basest form of a state created threat; to wit, a threat that is purposefully generated and effected by the state's knowingly and/or wilful alliance with private citizens to deprive an innocent person of his rights.

**ADDITIONAL FACTUAL ALLEGATIONS RE
DEFENDANT NYPD PURSUANT TO THE ORDER
OF THE HON. MAGISTRATE JUDGE BLOOM**

365) Pursuant to the Order of the Hon. Magistrate Judge Lois Bloom, directing plaintiff to "Plaintiff's Second Amended Complaint should set forth the facts which would permit identification of the unknown defendants," plaintiff avers the following:[14]

366) Plaintiff Towns' former Sunday School instructor, Mrs. Eartha Washington, provides this court with an account of her observations at plaintiff Cornerstone on October 13th, 2013. (Annexed hereto and made a part hereof is a true and complete copy of the said Mrs. Eartha Washington's Affidavit, the same designated as *Exhibit H.*)

367) Said Mrs. Eartha Washington is a defendant Cornerstone member for more than 60 years.

368) She avers that she served as defendant Cornerstone's Dean of Christian Education at the defendant Cornerstone Baptist Church for a 15-year period. Thus, acting as the designer, coordinator and implementer of the said church's educational processes.

369) Likewise, she has been a certified Dean for fifteen (15) years.

---

[14]     This Court is cognizant that plaintiff has filed objections to said direction but seeks to fully comply with said directive.

370) The plaintiff's said witness has been a Christian Education instructor for more than 40 years and functioned in that capacity during the period that plaintiff attended Mrs. Washington's Sunday School class.

371) Additionally, her Christian educational duties included instruction at the New York State Eastern Baptist Convention and at the National Baptist Convention.

372) Said Mrs. Washington currently serves as a chaplain for the State of New York, and has functioned in that capacity for over seven years.

373) The plaintiff's witness has been a devoted missionary, in service to Jesus in South Africa, East Africa, North Africa, and the Isle of Dominica as a mission worker.

374) Mrs. Washington proceeds to inform the Court that she selected plaintiff Towns to make the religious presentation on the topic, "We Are Connected." See, ¶¶ 16-19, Pgs. 4

375) Mrs. Washington confirms that plaintiff Towns rendered religious declaration on Sunday, September 29th, 2013. ¶¶ 21-22, Pgs. 4-5

376) She informs the Court that plaintiff informed her that he would not attend Sunday School class on Sunday, October 13th, 2013, because plaintiff had received the heretofore described October 10th, 2013 Terror Threat.

377) However, Mrs. Washington did attend her Sunday School class on October 13th, 2013, and this Christian elder of more than 60 years provides her personal observations of that morning:

> When I arrived at Cornerstone Baptist Church on the Sunday morning of October 13th, 2013, I saw a New York City police van in front of Cornerstone Baptist Church.
>
> This was between 9:00 A.M. and 9:20 A.M.
>
> I thought that someone must have taken ill.
>
> Your deponent entered the Cornerstone Baptist Church sanctuary and to her amazement observed police officers in the sanctuary. They appeared to be all over the place, because I saw them downstairs in the basement area where deponent conducts her Sunday School class; I observed them in the balcony area of the sanctuary and in the church's chapel area.
>
> These police officers stayed inside the church until about 11:30 A.M.
>
> The only times I have seen such police presence at Cornerstone Baptist Church persons such as the governor, mayor or other dignitary would make a special appearance. There was no such guest on Sunday, October 13, 20th, 2013.
>
> Your deponent later learned that the police were present because they were looking for someone who did not belong in the church.

378) Ergo, the witness places defendant NYPD police officers inside the defendant Cornerstone's sanctuary and "all over the place" for a period of at least two (2) hours within approximately seventy-two (72) hours after the October 10th, 2013 Terror Threat assured plaintiff that he would "be arrested."

379) The foregoing provides more than adequate information for a para military police force, believed to employ an extensive record keeping protocol, to identify the specific personnel present on October 13th, 2013, and the specific purpose that occasioned their presence.

380) Likewise, plaintiff Towns believes that the defendant NYPD maintain a Chart of specific assignments as pertains to the daily operations for its entire staff. Such Chart is believed to have specifics as to the duties of all defendant NYPD personnel.

381) Thus, said assignment chart would provide detailed data as to whom was at and in the defendant Cornerstone's premises on October 13th, 2013 and, again, on October 20th, 2013.

382) In addition thereto, if this "operation" were designated as a "Special Operation," it is believed that there is a lieutenant or other supervisory personnel that oversaw such an operation.

383) That person or persons would likely be set forth on such Chart of operations or other similar documents.

384) Upon information and belief, the defendant NYPD has a daily roll call that is supervise by one or more supervisory personnel.  Plaintiff believes roll calls are

employed to provide instructions to police personnel regarding conditions they may encounter and duty requirements an assigned shift.

385) It is believed that records of such roll call would contain the specifics as to what personnel were assigned to defendant Cornerstone on October 13th, 2013, as averred by Mrs. Eartha Washington.

386) The foregoing belief is predicated upon plaintiff's online research of a purported 2005 NYPD Patrol Guide, and though dated comports with some of your deponent prior experiences when he has tried criminal cases in the Courts of New York. (To wit, defendant NYPD officers maintain memo books, file detailed reports of incidents and various records are computerized; police personnel are required to account for all hours of the on duty conduct and it is believed that such memo book records are reviewed by supervisory personnel. Ergo, there is every reason to believe that daily defendant NYPD assignments are recorded and reviewed. And as hereinabove described, details of incidents, unlawful or other conduct requiring investigation are recorded.)

## FACTUAL ALLEGATIONS RE DISTRICT ATTORNEY'S OFFICE OF KINGS COUNTY AND CHARLES HYNES

387) One can only describe defendant Hynes' role in the events as frighteningly perilous.

91

388) It is believed that defendant Hynes used his position of power, authority and influence, as Kings County District Attorney, to facilitate, aid and/or abet the Cornerstone defendants in their effort to perpetrate the constitutional, statutory and/or civil rights violations laid bare in plaintiff's complaint and to facilitate, aid and/or abet the Cornerstone defendants' violation of the New York State Law.

389) However, dubious this assertion appears upon its initial consideration the claim becomes definitively probable when considered in the light of New York City Department of Investigation's Findings re defendant Hynes.

390) Said report does not bear a date but can be found at the following web address:

http://s3.documentcloud.org/documents/1180375/brooklyndocument.txt
(Hereinafter referred to as the *Hynes Findings*)

391) A New York Times article indicates that the report may have been dated June 2, 2014. (See, The New York City Department of Investigation's Findings on Charles J. Hynes  @

http://www.nytimes.com/interactive/2014/06/03/nyregion/03brooklyn.ht ml.)

392) It was disclosed that defendant Hynes, in an obsessive effort to win re-election in 2013, appears to have broken multiple laws.

393) To wit, said Hynes Findings disclosed that in calendar years 2012 and 2013, KCDA [Kings County District Attorney] issued checks to a non-District Attorney private entity, Matz, Blancato Associates, totaling $219,924. *Id*, Page 1

394) The Kings County District Attorney's office also apprised the DOI that its office had issued checks between 2003-2013 totaling approximately $1.1 million dollars to the said private entity. *Id.*

395) The Hynes Findings further informs that this private entity, "was serving primarily if not exclusively as a political consultant to Hynes personally, and that he [Matz, private consultant] had a major role in orchestrating Hynes' 2013 reelection campaign." *Id*

396) Furthermore, it was discovered that Hynes,

> ...Used KCDA personnel and e-mail resources in connection with his ultimately unsuccessful 2013 reelection campaign, by exchanging several thousand campaign related emails with individuals both within and outside the KCDA, and enlisting the help and support of KCDA personnel in connection with his campaign. Several high level KCDA staff appeared to have assisted Hynes in his reelection campaign. As indicated by the dates and time-stamps associated with these e-mails, many of them were sent and received during regular KCDA business hours. *Id*

397) The aforesaid Hynes Findings powerfully concludes as follows:

> As described herein, investigation has SUBSTANTIATED: (1) possible violations of Chapter 68 of the New York City Charter by Hynes and other senior members of his KCDA staff, including Jerry Schmetterer, Dino Amoroso, Amy Feinstein, Anne Swern and Henna

White; (2) possible violations of the Code of Judicial Conduct by Judge Kamins. (*sic*) investigation also describes possible criminal conduct with respect to the personal services Matz provided to Hynes, which services -appear to have been paid for, at least in part, from KCDA state forfeiture funds.

DOI will refer these findings to the appropriate civil and criminal authorities. *Id*, Page 25]

398) Notwithstanding the illegality, defendant Hynes was defeated in the September 2013 primary and ultimately decided to run as a Republican in the general election.

399) This court can take judicial notice of the fact that the likelihood of Republican winning an election in the borough of Brooklyn was exceedingly small in 2013.

400) As noted in a November 6, 2013, New York times article,

But Mr. Hynes's attempt to preserve his political career — which saw him rise from junior prosecutor to candidate for governor — did not succeed in a borough where Democrats outnumber Republicans by more than 800,000. Though he had hoped his lengthy record would attract Democratic crossover votes, he was losing 27.9 percent to Mr. Thompson's 72.1 percent with 58 percent of precincts reporting. Online                                   citation: http://www.nytimes.com/2013/11/06/nyregion/thompson-claims-victory-over-hynes-again-for-brooklyn-district-attorney.html

401) However, the defendant Hynes decided to make a desperate attempt to win the general election after his September 2013 Democratic primary defeat.

402) Hence, the events at issue having occurred on September 29th, 2013, and defendant Hynes having a little over a month to win the general election prize evidenced a predisposition to do anything to obtain electoral victory, whether illegal or otherwise.

403) Hence, defendant Hynes was ripe for the picking by Cornerstone defendants.

404)   Upon information and belief, said Cornerstone defendants used this opportunity to reach out to defendant Hynes and engaged him in their malevolent, illegal and/or criminal conspiracy against plaintiff Towns.[15]

405) Furthermore, or in the alternative, said Cornerstone defendants utilize their relationship with defendant Hynes to importune defendant Hynes, Sam Soes 1-10 and/or Sadie Coes 1-10, to facilitate the conspiracy and/or other conduct set forth in plaintiff Towns' complaint.

406) Moreover, as defendant Hynes had developed a pattern of indulging in illegal conduct in his distressed attempt to avoid a primary defeat in September 2013, it was of no genuine moment for him to pursue a few more votes by assisting the these Cornerstone defendants and/or its other operatives.

---

[15]    Plaintiff believes that a number of the Cornerstone defendants, including but not limited to defendants Henson and Price, had a prior relationship with defendant Hynes.

407) Thus, the Terror Threat of October 10th, 2013's statement "This decision has been considered and approved by the Cornerstone Board of Deacons, with cooperation and input from the Kings County District Attorney's Office and the 81st Precinct," becomes an operative realities and a very credible admission against defendant Hynes.

408) Furthermore, as defendant Hynes had demonstrated a sustained countenance for illegal activity there is no trouble in reasonably inferring that defendant Hynes, had a propensity to engage in unlawful conduct herein at issue, for said defendant Hynes was obsessed with his reelection goal.

409) Consequently, it is a reasonable and/or plausible conclusion that the words of the October 10th, 2013 Terror Threat only confirm that said defendant Hynes made his official position of power, authority and/or influence, as Kings County District Attorney, available to facilitate, aid and/or abet the Cornerstone defendants in their effort to perpetrate the constitutional, statutory and/or civil rights violations laid bare in plaintiff's complaint and/or to facilitate, aid and/or abet the Cornerstone defendants' violation of the New York State Laws.

410) Moreover, the foregoing establishes a firm foundation to understand why no charges were issued against plaintiff, for, as established and/or reasonably inferred, this effort appears to have been led and/or facilitated by defendant Hynes.

411) Additionally, this also provides a rationale why defendant NYPD conducted no investigation of the events herein at issue, as required by defendant NYPD's Patrol Guide.

## FACTUAL ALLEGATIONS
## RE CORNERSTONE BAPTIST CHURCH

412)     The defendant Cornerstone's history of religious service began in 1917.

413)     Plaintiff believes that defendant Cornerstone is known throughout the nation and particularly within the community of the National Baptist Association.

414)  Upon information and belief and at all times hereinafter mentioned, the said  defendant Cornerstone was the beneficiary of federal, state and city of New York tax exemption in its capacity as a religious and/or not-for-profit corporation.

415)     Upon information and belief, during the course of its history, defendant Cornerstone has been the beneficiary of valuable stock gifts and/or other forms of assets provided and/or gifted by benefactors.

416)  That on a day certain the membership of the defendant Cornerstone duly adopted amended by-laws for the governance of said defendant Cornerstone.

417) Upon information and belief, the amended by-laws of said defendant Cornerstone have been in effect during the entire period applicable in this lawsuit and/or at issue herein.

418) As pertains to this lawsuit, Article XII of said defendant Cornerstone's amended by-laws specifically directs:

> There shall be appointed a certified accountant to examine the accounts of the Church, and of its fiscal management system annually. This appointment shall be determined by the Board of Trustees and such accountant's report presented by the Board of Trustees at a regular business meeting of the Church. See, Page 35 of said By-Laws.[16]

419) Defendants, Parks, Shell, Henson and/or Rock are each believed to be current members or former members of defendant Cornerstone's Board of Trustees.

420) Defendant Parks is believed to be said defendant Cornerstone's current chair of said Board of Trustees.

421) Defendant Shell is believed to be the immediate past chair of said defendant Cornerstone's Board of Trustees.

---

[16]    At ¶¶234-243, Pgs. 50-52, *supra,* plaintiff Towns has detailed how powerful biblical references are employed to motivate people to "give as unto the Lord."

Such ploys only heighten the necessity for substantial financial oversight.

422) Upon information received from Cornerstone members, Rev. Claudette Davis, Messrs. Denson and Reuben Braxton and Mrs. Eartha Washington, did inform plaintiff Towns that said defendants, Parks, Shell, Henson, Rock and/or other members of said Board of Trustees whose names are not currently known to plaintiff Towns, have severally and /or jointly failed to retain the services of a certified accountant or certified public accountant for the period commencing January 1st, 2005, through and including December 31st, 2014.  Therefore, the defendant Cornerstone's members have not received an audited financial report for at least nine (9) years.

423) Upon information and belief, throughout the entire nine (9) year period herein at issue various members of the defendant Cornerstone have repeatedly demanded that defendant Cornerstone's pastor, officers, trustees and/or officials retain the services of a certified accountant or a certified public accountant for the purpose of conducting the required examination of the accounts and fiscal management systems of said defendant Cornerstone.

424) Notwithstanding the repeated demands of said defendant Cornerstone's members, said defendant Cornerstone's officers have not retained the services of a certified public accountant or certified accountant to conduct the independent financial investigation as heretofore required by Article XII of defendant Cornerstone's By-laws.

425) Upon information and belief, this failure has continued to date.

426) Additionally, upon information and belief and at all times hereinafter mentioned, it has become the custom and/or practice of numerous religious corporations in the City and State of New York, to conduct annual audits of their books, records and/or financial condition.

427) Upon information and belief and at all times hereinafter mentioned, various entities that provide assistance and/or support to religious and/or not for profit corporations in the City and State of New York, have encouraged such entities to conduct annual audits of their books, records and/or financial condition.

428) Notwithstanding this growing trend and/or custom the within defendant Cornerstone and/or Cornerstone defendants have consistently failed to perform such audits for the said period commencing with January 1st, 2005, through and including December 31st, 2014.

429) Such ongoing failure has led to suspicion as to the use of monies contributed to the defendant Cornerstone and/or disdain for defendant Cornerstone's by-laws and the governing laws, procedures and/or policies of the Internal Revenue Service of the United States of America and the State of New York.

430) Moreover, defendant Cornerstone's members have no idea how defendant Cornerstone and its officers are truly expending their gifts, donations and/or offerings.

431) Additionally, plaintiff Towns would occasionally contribute small sums to defendant Cornerstone, thus, he is entitled to an accounting that identifies how these donated funds were used.

### COUNT 1 – 42 USC 1983 CONSPIRACY AGAINST DEFENDANTS

CORNERSTONE BAPTIST CHURCH, AKER, FRALEY, CHAVIS, SR., CHAVIS, JR., BYRD, HENSON, BYRON HOWELL, HENSON, HICKS, SWANN, WOOD, LANE, SPELLMAN, MOORE, AMAZIAH HOWELL, COSTON, COX, PRICE, WEBB, RON SAES 1-15 AND RACHAEL LOES 1-15

BLOOMBERG, KELLY, NEW YORK CITY POLICE DEPARTMENT, JOHN DOES 1-15 AND JANE ROES 1-15, NEW YORK CITY, CHARLES HYNES, THE KINGS COUNTY DISTRICT ATTORNEY'S OFFICE AND SAM SOES 1-10 AND SANDIE COES 1-10

432) Plaintiff Towns incorporates by reference all preceding paragraphs as if the same had been set forth herein in their entirety.

433)    Defendant Cornerstone and the aforesaid Cornerstone defendants and/or Ron Soes 1-15 and Rachael Roes 1-15 (All collectively hereinafter referred to as *Cornerstone defendants*) did, under color of law, jointly and/or severally conspire with one another and/or with defendants, New York City Police Department, John Doe 1-15 and Jane Roe 1-15, New York City, Charles Hynes, the

Kings County District Attorney's Office and/or Sam Soes 1-10 and/or Sadie Coes 1-10 (All hereinafter collectively referred to as *Municipal Defendants*) to deprive plaintiff Towns of his constitutional right to freedom of religion and/or his right to exercise his religious beliefs, worship in the manner that he had chosen and/or for utilizing his right to free speech and/or right of expression and/or associating with whom he had chosen and/or speaking in the manner he had chosen and/or his right to exercise other constitutional, statutory and/or civil rights, including but not limited to his right to be free from active terror threats, free from personal threat to his physical and/or emotional person to the illegal and/or unlawful bodily invasion and/or assault, free from affirmatively created and/or enhanced danger of state-sponsored violence and/or violation of his personal substantive and/or due process rights, as more fully set forth in ¶ 260 at Pg. 57, herein *Supra.*

434) In furtherance of the said conspiracy and in order to affect the same Cornerstone defendants, with the aid, support, backing and/or encouragement of aforesaid municipal defendants did subject plaintiff Towns to public disparagement, ridicule, scorn and/or derision.

435) Cornerstone defendants did, under color of law, jointly and/or severally communicate with one or more of the municipal defendants and said Cornerstone defendants, collectively and/or severally, did knowingly, intentionally, recklessly, wantonly and/or negligently provide information and/or allegations of fact concerning said plaintiff Towns known to them to be wholly fabricated and/or

that they should well have known to be wholly fabricated and/or with reasonable effort would have been made known to have been wholly fabricated.

436) Or, alternatively, Cornerstone defendants did jointly and/or severally communicate with one or more of the municipal defendants and said Cornerstone defendants, collectively and/or severally, did knowingly, intentionally, recklessly, wantonly and/or negligently provide information and/or allegations of fact concerning said plaintiff Towns  known to them to be wholly fabricated and/or that they should well have known to be wholly fabricated and/or with reasonable effort would have been made known to have been wholly fabricated.

437) Cornerstone defendants, under color of law, jointly and/or severally issue a Terror Threat written communication, the same dated October 10, 2013, specifically addressed to plaintiff Towns and had the same transported through the United States Postal Service for the purpose of depriving plaintiff Towns of his said constitutional, statutory and/or civil rights and/or with intent to harass, annoy, threaten, alarm and/or inflict emotional distress upon plaintiff Towns, and/or for the further purpose of infecting said plaintiff Towns with fear for safety of life and limb and/or to "chill" said plaintiff from exercising constitutional, statutory and civil rights, as hereinabove detailed, and/or to retaliate against plaintiff Towns for exercising said rights, including but not limited to his oral protest and religious proclamation of September 29th, 2013.

438) Or, alternatively, Cornerstone defendants jointly and/or severally issue a Terror Threat written communication, the same dated October 10, 2013, specifically addressed to plaintiff Towns and had the same transported through the United States Postal Service for the purpose of depriving plaintiff Towns of his said constitutional, statutory and/or civil rights and/or with intent to harass, annoy, threaten, alarm and/or inflict emotional distress upon plaintiff Towns, and/or for the further purpose of infecting said plaintiff Towns with fear for safety of life and limb and/or to "chill" said plaintiff from exercising constitutional, statutory and civil rights , as hereinabove detailed, and/or to retaliate against plaintiff Towns for exercising said rights, including but not limited to his oral protest and religious proclamation of September 29th, 2013.

439) Defendants Cornerstone and Cornerstone defendants, did, under color of law, issue one or more false reports, statements and/or testimony to one or more of the within named municipal defendants pertaining to said plaintiff Towns.

440) Cornerstone defendants did circulate false and/or defamatory information concerning plaintiff Towns in an effort to discourage him from telling authorities and/or courts the truth of what was done to him and/or to diminish the credibility of any information and/or testimony he would give.

441) Said acts were admittedly done under color of law and/or via a conspiracy, with joint support, cooperation and/or aid of municipal defendants; in that the said municipal defendants did "cooperate" and/or provide "input" to the aforesaid Cornerstone defendants with respect to the aforesaid acts herein set forth.

442) Moreover, said municipal defendants did actively engage in affecting effectuating said state created threat by deploying armed defendants John Does 1-15 and/or Jane Roes 1-15, who are believed to be New York Police Department police officers,to intervene, detain, harass, arrest and/or otherwise subject plaintiff Towns to stated created threat at the defendant Cornerstone's principal location, to wit, 562-574 Madison Street, Brooklyn, New York, on Sunday, October 13, 2013, and/or on Sunday, October 20, 2013.

443) Said acts, singularly and/or collectively constitute a violation of 42 USC §1983.

444) In addition thereto, and/or alternatively, as a direct and proximate result of the foregoing plaintiff Towns suffered grievous injury, severe emotional distress and/or violation of multiple fundamental constitutional, statutory and/or other civil rights all in violation of 42 USC 1983, as more particularly set forth herein at ¶ 260 at Pg. 57, herein *Supra*.

445) Said injuries continue to date.

## COUNT 2 - 42 USC Section 1983–RETALIATION

## BY CONSPIRACY AGAINST DEFENDANTS

CORNERSTONE BAPTIST CHURCH, AKER, FRALEY, CHAVIS, SR., CHAVIS, JR.,
BYRD, HENSON, BYRON HOWELL, HENSON, HICKS, SWANN, WOOD, LANE,
SPELLMAN, MOORE, AMAZIAH HOWELL, COSTON, COX, PRICE, WEBB
RON SAES 1-15 AND RACHAEL LOES 1-15

BLOOMBERG, KELLY, NEW YORK CITY POLICE DEPARTMENT,
JOHN DOES 1-15 AND JANE ROES 1-15,
NEW YORK CITY, CHARLES HYNES,
THE KINGS COUNTY DISTRICT ATTORNEY'S OFFICE
AND SAM SOES 1-10 AND SANDIE COES 1-10

446) Plaintiff Towns incorporates by reference all preceding paragraphs as if the same had been set forth herein in their entirety.

447) Said October 10th, 2013 Terror Threat speaks for itself as pertains to and establishing a claim for retaliation.

448) Said Cornerstone defendants' issuance, endorsement, publication and/or promulgation of the October 10th, 2013 Terror Threat speaks for itself as pertains to and/or establishing a claim for retaliation.

449) To wit, that the Terror Threat was executed no more than eleven days after plaintiff Towns' hereinabove religious proclamation of Sunday, September 29th, 2013, thus, establishing temporal proximity.

450) Said Cornerstone defendants' intent, *inter alia,* was to retaliate against plaintiff Towns for his oral protest and religious proclamation.

106

451) As heretofore established, said religious proclamation was rendered at the request of plaintiff Towns' Sunday School instructor, Mrs. Eartha Washington, and plaintiff was duly recognized and called upon by defendant Hicks to render his oral protest and religious proclamation on Sunday, September 29th, 2013.

452) Plaintiff Towns did use his aforesaid religious proclamation to convey firmly held religious beliefs, as specifically set forth in said statement.

453) Said Cornerstone defendants admit that the said acts were done under color of law as the October 10th, 2013 Terror Threat specifically conveys said Cornerstone defendants obtained the joint support, "input", "cooperation" and/or aid of the within named municipal defendants.

454) Moreover, said "input" and "cooperation" of Municipal defendants included but was not limited defendants John Does 1-15 and/or Jane Roes 1-15 in effectuating said state created threat by deploying armed defendants John Does 1-15 and/or Jane Roes 1-15 to intervene, detain, harass, arrest and/or otherwise subject plaintiff Towns to stated created threat at the defendant Cornerstone's principal location, to wit 562 – 574 Madison Street, Brooklyn, New York, on Sunday, October 13, 2013, and/or on Sunday, October 20, 2013.

455) The record before this Court establishes municipal defendants perverted themselves and became the servants of evil doers.

456)  Said acts were retaliatory and/or served as a potent weapon in "chilling" plaintiff's first amendment free speech rights, etc., as more particularly set forth herein at ¶¶184 at Pg. 40, ¶¶260 and 261 at Pgs. 56-57.

457) Accordingly, as a direct and proximate result of the foregoing plaintiff Towns suffered grievous injury, severe emotional distress and/or violation of multiple fundamental constitutional, statutory and/or other civil rights all in violation of 42 USC 1983, as more particularly set forth herein at ¶¶184 at Pg. 40, ¶¶260 and 261 at Pgs. 56-57.

**458)**  Said injuries continue to date.

## COUNT 3 - 42 USC Section 1983–RETALIATION

## AGAINST DEFENDANTS

DEFENDANTS CORNERSTONE BAPTIST CHURCH, AKER, FRALEY, CHAVIS, SR., CHAVIS, JR., BYRD, HENSON, BYRON HOWELL, HENSON, HICKS, SWANN, WOOD, LANE, SPELLMAN, MOORE, AMAZIAH HOWELL, COSTON, COX, PRICE, WEBB, HIM

RON SAES 1-15 AND RACHAEL LOES 1-15

BLOOMBERG, KELLY, NEW YORK CITY POLICE DEPARTMENT,
JOHN DOES 1-15 AND JANE ROES 1-15,
NEW YORK CITY, CHARLES HYNES,
THE KINGS COUNTY DISTRICT ATTORNEY'S OFFICE
AND SAM SOES 1-10 AND SANDIE COES 1-10

459) Plaintiff Towns incorporates by reference all preceding paragraphs as if the same had been set forth herein in their entirety.

460) Said Cornerstone defendants' issuance, endorsement, publication and/or promulgation of the October 10th, 2013 Terror Threat speaks for itself as pertains to and/or establishing a claim for retaliation.

461)    Said Cornerstone defendants' issuance, endorsement, publication and/or promulgation of the October 10th, 2013 Terror Threat speaks for itself as pertains to and/or establishing a claim for retaliation.

462) To wit, that the Terror Threat was executed no more than eleven days after plaintiff Towns' hereinabove religious proclamation of Sunday, September 29th, 2013, thus, establishing temporal proximity.

463) Said Cornerstone defendants' intent, *inter alia,* was to retaliate against plaintiff Towns for his oral protest and religious proclamation

464) As heretofore established, said his oral protest and religious proclamation was rendered at the request of plaintiff Towns' Sunday School instructor and plaintiff was duly recognized and called upon by defendant Hicks to render his oral protest and religious proclamation on Sunday, September 29th, 2013.

465) Plaintiff Towns did use his aforesaid oral protest and religious proclamation to convey firmly held religious beliefs, as specifically set forth in said statement.

466) Said Cornerstone defendants admit that the said acts were done under color of law as the October 10th, 2013 Terror Threat specifically conveys said Cornerstone defendants obtained the joint support, "input", "cooperation" and/or aid of the within named municipal defendants.

467) Thus, said municipal defendants were the principal catalytic agents wilfully, knowingly, recklessly and/or without regard for their respective legal obligations to protect persons such as plaintiff Towns who innocently entered their jurisdiction to exercise his constitutional, statutory and/or civil rights, from state created threats, whether explicit and/or implicit, actions and/or inactions that emboldened private citizens and/or municipal employees to injure said plaintiff; and, in addition thereto, failed to take steps and/or implementing procedures that minimized risks of state created threats and/or actions that

emboldened both municipal employees and/or private citizens to injure said plaintiff Towns and/or to stop employees of defendant City from assisting in creating and/or increasing the danger to innocent persons such as plaintiff Towns.

468) Moreover, said municipal defendants did actively engage in effectuating said state created threat by deploying armed defendants John Does 1-15 and/or Jane Roes 1-15 to intervene, detain, harass, arrest and/or otherwise subject plaintiff Towns to stated created threat at the defendant Cornerstone's principal location, to wit 562 – 574 Madison Street, Brooklyn, New York, on Sunday, October 13, 2013, and on Sunday, October 20, 2013.

469) The record before this Court establishes municipal defendants perverted themselves and became the servants of evil doers.

470) Hence, the aforesaid acts were retaliatory and/or served as a potent weapon in "chilling" plaintiff's first amendment free speech rights, etc., as more particularly set forth herein at ¶184 at Pg. 41, ¶¶260 and 261 at Pgs. 57-58.

471) Accordingly, as a direct and proximate result of the foregoing plaintiff Towns suffered grievous injury, severe emotional distress and/or violation of multiple fundamental constitutional, statutory and/or other civil rights all in violation of 42 USC 1983, as more particularly set forth herein at ¶184 at Pg. 41, ¶¶260 and 261 at Pgs. 57-58.

472) Accordingly, as a direct and proximate result of the foregoing plaintiff Towns suffered grievous injury, severe emotional distress and/or violation of multiple fundamental constitutional, statutory and/or other civil rights all in violation of 42 USC 1983

473) Said injuries continue to date.

### COUNT 4 -42 USC Section 1983-STATE CREATED THREAT
### AGAINST

DEFENDANTS CORNERSTONE BAPTIST CHURCH, AKER, FRALEY, CHAVIS, SR., CHAVIS, JR., BYRD, HENSON, BYRON HOWELL, HENSON, HICKS, SWANN, WOOD, LANE, SPELLMAN, MOORE, AMAZIAH HOWELL, COSTON, COX, PRICE, WEBB, HIM Ron Saes 1-15 and Rachael Loes 1-15

BLOOMBERG, KELLY, NEW YORK CITY POLICE DEPARTMENT, JOHN DOES 1-15 AND JANE ROES 1-15, NEW YORK CITY, CHARLES HYNES, THE KINGS COUNTY DISTRICT ATTORNEY'S OFFICE AND SAM SOES 1-10 AND SANDIES COE 1-10

474) Plaintiff Towns incorporates by reference all preceding paragraphs as if the same had been set forth herein in their entirety.

475) Said Cornerstone defendants' issuance, endorsement, publication and/or promulgation of the October 10th, 2013 Terror Threat speaks for itself as pertains to and/or establishing a claim for retaliation.

112

476) To wit, that the Terror Threat was executed no more than eleven days after plaintiff Towns' hereinabove religious proclamation of Sunday, September 29th, 2013, thus, establishing temporal proximity.

477) Said Cornerstone defendants' intent, *inter alia,* was to retaliate against plaintiff Towns for his oral protest and religious proclamation of September 29th, 2013.

478) As heretofore established, plaintiff Towns' oral protest and religious proclamation was rendered at the request of plaintiff Towns' Sunday School instructor and plaintiff was duly recognized and called upon by defendant Hicks to render his oral protest and religious proclamation on Sunday, September 29th, 2013.

479) Plaintiff Towns did use his aforesaid oral protest and religious proclamation to convey firmly held religious beliefs, as specifically set forth in said statement.

480) Said Cornerstone defendants admit that the said acts were done under color of law as the October 10th, 2013 Terror Threat specifically conveys said Cornerstone defendants obtained the joint support, "input", "cooperation" and/or aid of the within named municipal defendants.

113

481) Thus, said municipal defendants were the principal catalytic agents wilfully, knowingly, recklessly and/or without regard for their respective legal obligations to protect persons, such as plaintiff Towns, who innocently entered their jurisdiction to exercise constitutional, statutory and/or civil rights, from state created threats, whether explicit or implicit, actions and/or inactions that emboldened private citizens and/or municipal employees to injure other persons, such as plaintiff; and, in addition thereto, failed to take steps and/or implementing procedures that minimized risks of state created threats and/or actions that emboldened both municipal employees and/or private citizens to injure said plaintiff Towns and/or to stop employees of defendant City from assisting in creating and/or increasing the danger to innocent persons such as plaintiff Towns.

482) Moreover, said municipal defendants did actively engage in affecting effectuating said state created threat by deploying armed defendants John Does 1-15 and/or Jane Roes 1-15 to intervene, detain, harass, arrest and/or otherwise subject plaintiff Towns to stated created threat at the defendant Cornerstone's principal location, to wit 562 – 574 Madison Street, Brooklyn, New York, on Sunday, October 13, 2013, and on Sunday, October 20, 2013.

483) Thus, aid municipal defendants did actively and/or inactively deprive plaintiff Towns of his constitutional right to freedom of religion and/or his right to exercise his religious beliefs, worship in the manner that he had chosen and/or

for utilizing his right to free speech and/or right of expression and/or associating with whom he had chosen and/or speaking in the manner he had chosen and/or his right to exercise other constitutional, statutory and/or civil rights, including but not limited to his right to be free from active terror threats, free from personal threat to his physical and/or emotional person to the illegal and/or unlawful bodily invasion and/or assault, free from affirmatively created and/or enhanced danger of state-sponsored violence and/or violation of his personal substantive and/or due process rights.

484) The record before this Court establishes municipal defendants perverted themselves and became the servants of evil doers.

485) Hence, the aforesaid municipal defendants created, generated and/or implemented a state created threat.

486) Accordingly, as a direct and proximate result of the foregoing plaintiff Towns suffered grievous injury, severe emotional distress and/or violation of multiple fundamental constitutional, statutory and/or other civil rights all in violation of 42 USC §1983., as more particularly set forth herein at ¶184 at Pg. 41, ¶¶260 and 261 at Pgs. 57-58..

## COUNT 5 -42 USC Section 1983-FAILURE TO INTERCEDE

### AGAINST

CHAVIS, SR., CHAVIS, JR., BYRD, HENSON, BYRON HOWELL, WEBB, HICKS, SWANN, WOOD, LANE, SPELLMAN, MOORE, AMAZIAH HOWELL, COSTON, COX, PRICE, WEBB, RON SAES 1-15 AND RACHAEL LOES 1-15

BLOOMBERG, KELLY, NEW YORK CITY POLICE DEPARTMENT, JOHN DOES 1-15 AND JANE ROES 1-15, NEW YORK CITY, CHARLES HYNES, THE KINGS COUNTY DISTRICT ATTORNEY'S OFFICE AND SAM SOES 1-10 AND SANDIE COES 1-10

487) Plaintiff Towns incorporates by reference all preceding paragraphs as if the same had been set forth herein in their entirety.

488) Upon information and belief, defendants Rock, Shell, Chavis, Jr., Webb, Hicks, Swann, Wood, Lane, Spellman, Amaziah Howell, Coston, Cox, Price, and/or Parks did have personal and/or intimate knowledge and/or awareness concerning the actions taken against plaintiff Towns by defendants Aker, Fraley, Chavis, Sr., Byrd, Henson, Byron Howell, , Ron Saes 1-15 and Rachael Loes 1-15.

489) Said defendants, Rock, Shell, Chavis, Jr., Webb, Hicks, Swann, Wood, Lane, Spellman, Amaziah Howell, Coston, Cox, Price, and/or Parks and/or the municipal defendants, New York City Police Department, John Doe and Jane Roe 1-15, New York City, Charles Hynes, the Kings County District Attorney's Office and Sam Soes 1-10 and Sandie Coes 1-10 and/or Webb, each had opportunity to intercede on behalf of plaintiff Towns to prevent the previously mentioned violations of his said constitutional, statutory and/or civil rights.

116

490) Upon information and belief, said defendants, Jerome Rock, Chavis, Jr., Byron Howell, Webb, Hicks, Swann, Wood, Lane, Spellman, Amaziah Howell, Coston, Cox, Price and/or Webb, New York City Police Department, John Doe 1-15 and Jane Roe 1-15, New York City, Charles Hynes, the Kings County District Attorney's Office and Sam Soes 1-10 and Sandie Coes 1-10 took no steps to thwart, end and/or mitigate the aforesaid violation of plaintiff Towns' said constitutional, statutory and/or civil rights.

491) Said acts are believed to have been done under color of law via a conspiracy, joint support, cooperation and/or aid of New York City Police Department, John Doe and Jane Roe 1-15, New York City, Charles Hynes, the Kings County District Attorney's Office and Sam Soes and Sandie Coes 1-10, their respective officers, officials and/or senior personnel.

492) Said acts, and/or acts of omission singularly and/or collectively constitute a violation of 42 USC 1983.

493) In addition thereto, and/or alternatively, as a direct and proximate result of the foregoing plaintiff Towns suffered grievous injury, severe emotional distress and/or violation of multiple fundamental constitutional, statutory and/or other civil rights, as more particularly set forth at ¶184 at Pg. 41, ¶¶260 and 261 at Pgs. 57-58, herein *supra*, herein, all in violation of 42 USC 1983, and such injuries continue to date.

117

COUNT 6 - 42 USC Section 1985(3)
CONSPIRACY TO DEPRIVE
1ST AMENDMENT RIGHTS, WITH
RELIGIOUS ANIMUS, etc.

AGAINST DEFENDANTS

CORNERSTONE BAPTIST CHURCH AKER, FRALEY, CHAVIS, SR., CHAVIS, JR., BYRD,
HENSON, BYRON HOWELL, HENSON, WEBB,  HICKS, SWANN, WOOD, LANE,
SPELLMAN, MOORE, AMAZIAH HOWELL, COSTON, COX, PRICE, WEBB,
RON SAES 1-15 AND RACHAEL LOES 1-15

BLOOMBERG, KELLY, NEW YORK CITY POLICE DEPARTMENT,
JOHN DOES 1-15 AND JANE ROES 1-15,
NEW YORK CITY, CHARLES HYNES,
THE KINGS COUNTY DISTRICT ATTORNEY'S OFFICE
AND SAM SOES 1-10 AND SANDIES COE 1-10

494) Plaintiff incorporates by reference all preceding paragraphs as if the same had been set forth herein in their entirety.

495) Cornerstone defendants, did, jointly and/or severally conspire with one another and with the named municipal defendants to deprive plaintiff Towns of his constitutional right to freedom of religion and/or his right to exercise his religious beliefs, worship in the manner that he had chosen  and/or for utilizing his right to free religious speech and/or right of free religious expression and/or associating with whom he had chosen and/or speaking in the manner he had chosen and/or his right to exercise other constitutional and/or civil rights, and/or in retaliation for said plaintiff Towns' exercising said rights, including but not limited to his oral protest and religious proclamation of September 29th, 2013, as hereinabove set forth.

118

496) In addition thereto, said Cornerstone defendants were livid after plaintiff Towns rendered his September 29th, 2013 proclamation and immediately assaulted him thereafter.

497) Thus, said Cornerstone defendants, did privately conspire to retaliate against and attack plaintiff Towns because of their several and/or joint religious animus against plaintiff's firmly held religious beliefs, as heretofore stated.

498) More particularly and *inter alia*, said Cornerstone defendants did conspire and/or coordinate the issuance of the October 10th, 2013 Terror Threat.

499) Having done all this, Cornerstone defendants did solicit, petition, importune and/or beseech officers and/or officials of the municipal defendants in their conspiratorial endeavor to extirpate, threaten, impede, impair, and/or otherwise deprive the plaintiff Towns of his aforesaid constitutional and/or civil rights as hereinabove particularized.

500) Moreover, said municipal defendants did actively engage in affecting effectuating said state created threat by deploying armed defendants John Does 1-15 and/or Jane Roes 1-15 to intervene, detain, harass, arrest and/or otherwise subject plaintiff Towns to stated created threat at the defendant Cornerstone's principal location, to wit 562 – 574 Madison Street, Brooklyn, New York, on Sunday, October 13, 2013, and on Sunday, October 20, 2013.

501) The record before this Court establishes municipal defendants perverted themselves and became the servants of evil doers, Cornerstone defendants.

502) Said acts, singularly and/or collectively constitute violations of 42 USC 1985(3).

503) Accordingly, as a direct and proximate result of the foregoing plaintiff Towns suffered grievous injury, severe emotional distress and/or violation of multiple fundamental constitutional, statutory and/or other civil rights all in violation of 42 USC 1985(3).

504) In addition, thereto, plaintiff Towns was thus restricted from exercising his interstate and intra state right to free travel.

505) To wit, for said plaintiff Towns would be subjected to intervention, detention, harassment, arrest and/or otherwise subject plaintiff Towns to stated created threat arrested, not only for walking into the sanctuary of defendant Cornerstone, but for entering upon any locations that might be affiliated with said defendant Cornerstone. See, *Exhibit A*

506) Said injuries continue to date.

**COUNT 7 - 42 USC Section 1985(3)**
**CONSPIRACY TO DEPRIVE**
**PLAINTIFF'S RIGHTS WITH**
**RACIAL ANIMUS**

AGAINST DEFENDANTS

DEFENDANTS CORNERSTONE BAPTIST CHURCH, AKER, FRALEY, CHAVIS, SR., CHAVIS, JR., BYRD, HENSON, BYRON HOWELL, HENSON, HICKS, SWANN, WOOD, LANE, SPELLMAN, MOORE, AMAZIAH HOWELL, COSTON, COX, PRICE, WEBB, HIM Ron Saes 1-15 and Rachael Loes 1-15

BLOOMBERG, KELLY, NEW YORK CITY POLICE DEPARTMENT, JOHN DOES 1-15 AND JANE ROES 1-15, NEW YORK CITY, CHARLES HYNES, THE KINGS COUNTY DISTRICT ATTORNEY'S OFFICE AND SAM SOES 1-10 AND SANDIES COE 1-10

507)

508) Judge Scheindlin's 198-page in Floyd decision made critical findings as pertained to the racial animus of the defendant NYPD toward minorities in New York City. 959 F. Supp.2d 560

509) To wit, Judge Scheindlin determined that defendant NYPD had a record and/or history of consistently violating the due process and/or equal protection rights of minority groups within the defendant City of New York:

> [That] (1) The NYPD carries out more stops where there are more black and Hispanic residents, even when other relevant variables are held constant. The racial composition of a precinct or census tract predicts the stop rate *above and beyond* the crime rate.
>
> (2) Blacks and Hispanics are more likely than whites to be stopped within precincts and census tracts, even after controlling for other relevant variables. This is so even in areas with low crime rates, racially heterogeneous populations, or predominately white populations.

(3) For the period 2004 through 2009, when any law enforcement action was taken following a stop, blacks were 30% more likely to be arrested (as opposed to receiving a summons) than whites, for the same suspected crime.

(4) For the period 2004 through 2009, after controlling for suspected crime and precinct characteristics, blacks who were stopped were about 14% more likely — and Hispanics 9% more likely — than whites to be subjected to the use of force.

(5) For the period 2004 through 2009, all else being equal, the odds of a stop resulting in any further enforcement action were 8% *lower* if the person stopped was black than if the person stopped was white. In addition, the greater the black population in a precinct, the less likely that a stop would result in a sanction. Together, these results show that blacks are likely targeted for stops based on a lesser degree of objectively founded suspicion than whites. *Id*

510) Judge Scheindlin continues developing the factual record of NYPD's historical record of consistently violating the rights of minorities and/or persons of color as follows: "In short, I find that the "'institutional evidence'" — evidence regarding the actions or inactions of the NYPD — shows that the City has been deliberately indifferent to violations of the plaintiff class's Fourth and Fourteenth Amendment rights." *Id*, 959 F. Supp.2d 590

511) The *Floyd* Opinion also shines the purifying light of truth on the secreted supervisory sessions held at the 81st present located in Bedford-Stuyvesant Brooklyn.

512) To wit, a recorded statement of Lieutenant Delafuente's comments to police officers at the 81st Precinct demonstrated the contempt and hostility harbored by some supervisory officers:

> 'All right, I went out there [to Howard and Chauncey] yesterday and . . . we've got the old man out there with the grey hairs. A loud mouth. He thinks since he's 55 years old he's not going to get locked up. Well, guess what? I don't tolerate shit out there. He went in and two of his pals went in. All right? So we've got to keep the corner clear. . . . Because if you get too big of a crowd there, you know, . . . they're going to think that they own the block. We own the block. They don't own the block, all right? They might live there but we own the block. All right? We own the streets here. You tell them what to do'.[240] (In Footnote 240 Judge Scheindlin informs that there was testimony to the effect that Bedford Stuyvesant is 57% black.)[17] 959 F. Supp. 2d 597[18]

513) Officer Schoolcraft testified during the Floyd trial. He was an officer in the 81st Precinct and made secret recordings of one of its Lieutenants, that is, Lieutenant Delafuente.

514) Lieutenant 's Delafuente's recorded statement was as follows: That the police officers of the 81st present were "not working in Midtown Manhattan where

---

[17]     Plaintiff reminds the Court that defendant Cornerstone Baptist Church is located in the territorial jurisdiction of the 81st Precinct.

[18]     Approximately 152 years after President Lincoln issued the Emancipation Proclamation, former descendants of slaves still find themselves subjected to the degrading principle that even on the streets that they live they have no rights that officers of the defendant NYPD are required to respect. *Scott v. Sandford*, 60 U.S. 393 at 407 (1856)

    Thus, no matter where an African-American might set his or her feet in Bedford Stuyvesant Brooklyn, they are without any constitutional rights according to Lieut. Delafuente.

people are walking around smiling and happy but are working in Bed-Stuy where everyone's probably got a warrant." *Id*

515)     Judge Scheindlin discerns that Lieut. Delafuente's statements contained "troubling racial overtones;" in effect, Judge Scheindlin's conclusion was a more subtle way of expressing that this supervisory officer appeared to have racist feelings toward the black and/or Hispanic residents of Bedford-Stuyvesant. *Id*

516) Moreover, plaintiff Towns believes that the said 81st Precinct was the precinct that deployed its forces on October 13th, 2013 and, again, on October 20th, 2013, against plaintiff Towns, for the October 10th, 2013 Terror Threat identifies the 81st Precinct as the one who provided "input" and "cooperation."

517) Thus, with existing racial animus against its minority population the defendant NYPD personnel had no trepidation engaging in the conduct herein at issue.

518) Moreover, said municipal defendants did encourage, support, motivate otherwise authorize said Cornerstone defendants to threaten, intimidate, bully, terrorize and/or prompt alarm in plaintiff Towns that he would be subject to intervention, detention, harassment, arrest and/or otherwise subject to stated created threat arrested, and/or otherwise subjected to legal and/or physical threat to life and/or limb and/or other state authorized official sanction if he should

124

enter into or approach the premises of the defendant Cornerstone or otherwise exercise his constitutional, statutory and/or civil rights as hereinabove particularized, including his right to freely travel interstate and/or intrastate.

519) Thus, as heretofore recited, said municipal defendants were prime movers in generating the state created threat against innocent plaintiff Towns.

520) Said acts, singularly and/or collectively constitute a violation of 42 U.S.C. 1985(3).

521) In addition, thereto, and/or alternatively, as a direct and proximate result of the foregoing plaintiff Towns suffered grievous injury, severe emotional distress and/or violation of multiple fundamental constitutional, statutory and/or other civil rights all in violation of 42 U.S.C. §1985(3), and such injuries continue to date.

### COUNT 8 – 42 USC 1981 CONSPIRACY AGAINST DEFENDANTS

CORNERSTONE BAPTIST CHURCH, AKER, FRALEY, CHAVIS, SR., CHAVIS, JR., BYRD, HENSON, BYRON HOWELL, HENSON, HICKS, SWANN, WOOD, LANE, SPELLMAN, MOORE, AMAZIAH HOWELL, COSTON, COX, PRICE, WEBB, RON SAES 1-15 AND RACHAEL LOES 1-15

BLOOMBERG, KELLY, NEW YORK CITY POLICE DEPARTMENT, JOHN DOES 1-15 AND JANE ROES 1-15, NEW YORK CITY, CHARLES HYNES, THE KINGS COUNTY DISTRICT ATTORNEY'S OFFICE and Sam Soes 1-10 and Sandie Coes 1-10

522) Plaintiff incorporates by reference all preceding paragraphs as if the same had been set forth herein in their entirety.

523) As set forth herein, plaintiff Towns is of African-American ethnicity.

524) Moreover, plaintiff has averred that any potential intervention, interaction and/or contact with the defendant NYPD and its defendants John Does 1-15 and/or Jane Roes 1-15, was a potentially deadly risk; for plaintiff Towns believed defendants NYPD and its John Does 1-15 and/or Jane Roes 1-15 to have operated under the mindset that they "own[ed] the Bedford-Stuyvesant streets," and that any of the persons that were of African-American heritage were vested with no rights that said defendants were bound to respect.

525) Of equal import, plaintiff Towns was believed to have been targeted, threatened with "punishment and pains" as a result of the planning, writing, promulgation and/or issuance of the October 13th, 2013 Terror Threat; same was intended to result in plaintiff Towns coercive intervention, detention, imprisonment and/or arrest.

526) Thus, when Cornerstone defendants did, jointly and/or severally conspire with one another and with the within named Municipal defendants plaintiff Towns became a selected and/or selective target of the Municipal defendants though they had no justification and/or rationale for any intervention, detention, imprisonment and/or arrest of said plaintiff Towns.

126

527) Moreover, upon information and belief, said defendant NYPD mobilized to implement the use of physical force, whether lethal or otherwise, against plaintiff Towns to effectuate the planned and/or promised enforcement intervention, detention, imprisonment and/or arrest of said plaintiff on October 13th, 2013 and/or October 20th, 2013. Notwithstanding said municipal defendants' failed to obey the dictates of their Patrol Guide as hereinabove recited. See, ¶¶336-353, at Pgs. 79-83.

528) Furthermore, and/or in the alternative, said Cornerstone defendants and/or Municipal defendants actions selectively targeted and/or deprived plaintiff Towns of his constitutional right to freedom of religion and/or his right to exercise his religious beliefs, worship in the manner that he had chosen and/or for utilizing his right to free religious speech and/or right of free religious expression and/or associating with whom he had chosen and/or speaking in the manner he had chosen and/or his right to exercise other constitutional and/or civil rights, and/or in retaliation for said plaintiff Towns' exercising said rights, including but not limited to his oral protest and religious proclamation of September 29th, 2013, as hereinabove set forth; and/or to be free of unlawful and/or race motivated intervention, detention, imprisonment and/or arrest. See,

529) Upon information and belief, the within Cornerstone defendants and/or municipal defendants would not have subjected plaintiff Towns to the above described threat, intimidation and/or arrest if he had not been an African-

American person, and, particularly, an African-American in Bedford-Stuyvesant, Brooklyn.

530) As a result thereof, plaintiff was denied the right to "full and equal benefit of all laws;" more particularly, to be free from selective law enforcement, selectively subjected to the threat of intervention, detainment, harassment, arrest and/or state created threats or punishment; likewise, being subjected to violation of rights and privileges vested to persons pursuant to New York State *Human Rights Law*, §§291, 296; *Civil Rights Law* §§40, 40-c, as hereinafter set forth in Counts 9-13

531) The record before this Court establishes municipal defendants perverted themselves and became the servants of evil doers, Cornerstone defendants.

532) Said acts, singularly and/or collectively constitute violations of 42 USC 1981(c).

533) Accordingly, as a direct and proximate result of the foregoing plaintiff Towns suffered grievous injury and/or severe emotional distress.

534) Said injuries continue to date.

**COUNT 9 - 18 USC §248-FREE ACCESS TO CLINICS ENTRANCE**
**AGAINST**
**Defendants Cornerstone Baptist Church, Aker, Fraley, Chavis, Sr., Chavis, Jr., Byrd, Henson, Byron Howell, Henson, Hicks, Swann, Wood, Lane, Spellman, Moore, Amaziah Howell, Coston, Cox, Price, Webb, Ron Saes 1-15 and Rachael Loes 1-15 Bloomberg, Kelly, New York City Police Department, John Does 1-15 and Jane Roes 1-15, New York City, Charles Hynes, the Kings County District Attorney's Office and Sam Soes 1-10 and Sandies Coe 1-10**

535) Plaintiff Towns incorporates by reference all preceding paragraphs as if the same had been set forth herein in their entirety.

536) As heretofore established, plaintiff Towns' oral protest and religious proclamation was rendered at the request of plaintiff Towns' Sunday School instructor and plaintiff was duly recognized and called upon by defendant Hicks to render his oral protest and religious proclamation on Sunday, September 29th, 2013.

537) Plaintiff Towns did use his aforesaid oral protest and religious proclamation to convey firmly held religious beliefs, as specifically set forth in said oral protest and religious proclamation.

538) Defendant Webb's outburst of September 29, 2013, establishes said defendant Cornerstone's retaliatory intent.

539) Said Cornerstone defendants' issuance, endorsement, publication and/or promulgation of the October 10th, 2013 Terror Threat speaks for itself as pertains to and/or further establishing said defendant Cornerstone's retaliatory intent.

540) To wit, that the Terror Threat was executed no more than eleven days after plaintiff Towns' hereinabove religious proclamation of Sunday, September 29th, 2013, thus, establishing temporal proximity.

541) Said Cornerstone defendants' intent, inter alia, was to retaliate against plaintiff Towns for his oral protest and religious proclamation of September 29th, 2013, and/or to employ force, para-military force, pressure, strain, stress, and/or tension and/or the threat of force, pressure, strain, stress, and/or tension and/or physical obstruction and/or intimidation, terrorizing, browbeating, and/or bullying and/or interference with, blocking, hindering, impeding, and/or obstructing said plaintiff from lawfully exercising or seeking to exercise his aforesaid First Amendment right to religious freedom at the aforesaid religious place of worship, that is, defendant Cornerstone Baptist Church's house of worship located at 562-574 Madison Street, Brooklyn, New York.

542) Said Cornerstone defendants admit that the said acts were done with the joint support, "input", "cooperation" and/or aid of the within named municipal defendants, as set forth in the October 10th, 2013 Terror Threat.

543) Additionally, within 72-hours of the issuance of the aforesaid October 10, 2013 Terror Threat, the within named municipal defendants joined with the said Cornerstone defendants and/or became the principal catalytic agents of said Cornerstone defendants in wilfully, knowingly, and/or recklessly threatening and/or imposing force, para-military force, pressure, strain, stress, and/or tension and/or the threat of force, pressure, strain, stress, and/or tension and/or physical obstruction and/or intimidation, terrorizing, browbeating, and/or bullying and/or interference with, blocking, hindering, impeding, and/or obstructing said plaintiff from lawfully exercising and/or seeking to exercise his first amendment right of religious freedom at his chosen place of religious worship, to wit at defendant Cornerstone Baptist Church located at 562-574 Madison Street, Brooklyn, New York.

544) In fact, said municipal defendants, at the petition, importuning, behest, request and/or instance of the said Cornerstone defendants, did actively bring to bear against the within named plaintiff actual force, para-military force, pressure, strain, stress, and/or tension and/or the threat of force, pressure, strain, stress, and/or tension and/or physical obstruction and/or intimidation, terrorizing, browbeating, and/or bullying and/or interference with, blocking, hindering, impeding, and/or obstructing said plaintiff from lawfully exercising or seeking to exercise his aforesaid First Amendment right to religious freedom at the aforesaid

religious place of worship, defendant Cornerstone Baptist Church's house of worship located at 562-574 Madison Street, Brooklyn, New York.

545) The record before this Court establishes the municipal defendants perverted themselves and became the servants of evil doers, to wit, said Cornerstone defendants, and said municipal defendants and Cornerstone defendants acted individually and/or jointly in employing actual force, para-military force, pressure, strain, stress, and/or tension and/or the threat of force, pressure, strain, stress, and/or tension and/or physical obstruction and/or intimidation, terrorizing, browbeating, and/or bullying and/or interference with, blocking, hindering, impeding, and/or obstructing said plaintiff from lawfully exercising or seeking to exercise his aforesaid First Amendment right to religious freedom at plaintiff's chosen religious place of worship, defendant Cornerstone Baptist Church's house of worship located at 562-574 Madison Street, Brooklyn, New York.

534)546) Accordingly, as a direct and proximate result of the foregoing plaintiff Towns suffered grievous injury, severe emotional distress and/or violation of multiple fundamental constitutional, statutory and/or other civil rights all in violation of 18 USC §248(a)(2), as more particularly set forth herein at ¶184 at Pg. 41, ¶¶260 and 261 at Pgs. 57-58.

## RELATED NEW YORK STATE CLAIMS
## COUNT 10 9–INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## AGAINST DEFENDANTS

CORNERSTONE BAPTIST CHURCH AKER, FRALEY, CHAVIS, SR., CHAVIS, JR., BYRD, HENSON, BYRON HOWELL, HENSON, WEBB, HICKS, SWANN, WOOD, LANE, SPELLMAN, AMAZIAH HOWELL, COSTON, COX, PRICE, WEBB, RON SAES 1-15 AND RACHAEL LOES 1-15

BLOOMBERG, KELLY, NEW YORK CITY POLICE DEPARTMENT, JOHN DOES 1-15 AND JANE ROES 1-15, NEW YORK CITY, CHARLES HYNES, THE KINGS COUNTY DISTRICT ATTORNEY'S OFFICE AND SAM SOES 1-10 AND SANDIE COES 1-10

535)547) Plaintiff Towns incorporate by reference all preceding paragraphs as if the same had been set forth herein in their entirety.

536)548) The aforesaid named defendants did knowingly, intentionally and/or recklessly inflict upon plaintiff Towns severe emotional distress.

537)549) The actions of each of the above named defendants, singularly and/or jointly, were extreme and/or outrageous, shameful, offensive, contemptible and/or conduct, far beyond that abided in a mature civilized democracy.

538)550) Said conduct has been established to have been extreme and/or outrageous in varied and different ways by plaintiff Towns, but the Terror Threat of October 10th, 2013, stands as a marked demonstration of the disgraceful, shocking, offensive, and/or pernicious conduct defendants perpetrated against the within innocent plaintiff Towns.

133

~~539)~~551) The within complaint absolutely sets forth the causal connection between the extreme and/or outrageous, shameful, offensive and/or contemptible conduct and the injuries sustained by plaintiff Towns.

~~540)~~552) The within defendants threatened plaintiff Towns with existential bodily harm and/or threat to life and/or limb and/or intimidation, harassment and/or extreme emotional anguish for speaking his firmly held religious beliefs as hereinabove described thus, suffering emotional harm and/or distress. As a result of the course of conduct engaged in by the within named defendants plaintiff Towns was placed in "reasonable fear of physical injury."

~~541)~~553) New York State's Hate Crime Laws patently establish that infliction emotional harm and/or distress is of a magnitude greater when the motivating factor is religious animus. See, New York State's Aggravated Harassment statute, *Penal Code* §240.25; resulting in a violation of said state's *Hate Crime Laws,* to wit, Penal Code §485.05.

~~542)~~554) In addition thereto, the municipal defendants' acts and/or attacks against plaintiff Towns, in particular defendants NYPD and/or Jon Doe 1-15 and/or Jane Roe 1-15, were motivated by racial animus as established herein at Pages 98-101, ¶¶ 429-438, *supra.*

543)555) The Court should afford plaintiff Towns leave to corroborate the elements of harm sustained and the extent of the severity of the emotional damage and/or distress suffered.

544)556) Such factors will include but are not limited to:

a) A demonstration of the relationship between an assault upon plaintiff's religious belief structure(s) when combined with the assault motivated by racial animus;

b) A demonstration of how these acts are far more devastating to plaintiff Towns by reinforcing the reality that racism and intolerance remain a part of his daily life from October 12th, 2013, forward;

c) Moreover, plaintiff Towns is brought low;

d) Though having lived as a law-abiding citizen for more than 65-years at the time of this incident he was subjected to the heart-rending disgrace of this nation's enduring badge of slavery. To wit, as a descendant of slaves he remained a black man who was without any rights that the within municipal defendants felt bound to respect;

e) It did not matter to the defendants that he had attended defendant Cornerstone since childhood; had faithfully served defendant Cornerstone in multiple and varied capacities for decades and had faithfully given to the ministry for many years. Similarly, it counted for nothing that his grandmother, his father and mother had likewise

135

faithfully served and/or were stewards of defendant Cornerstone.  This was as excrement in the eyes of defendant Cornerstone;

f) In like manner, plaintiff's decades of service to the Bedford-Stuyvesant community, including with the Brooklyn NAACP, were of no import to the municipal defendants.  He was on street owned by Lieut. Delafuente and thus was without any rights that needed to be respected;

g) To the municipal defendants he was nothing more than a descendent of slaves.  How dreadful, how painful it is to discover your life means so little to the society you served for so long and urged your only child to likewise serve as an officer in the United States Navy.

545)557) In addition thereto, and/or alternatively, said emotional harm and/or injuries are a direct and proximate result of the hereinabove acts perpetrated by all the defendants named herein.


### COUNT 11 10–PLAINTIFF'S RECOVERY RIGHT FOR DEFENDANTS' VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW §291

CORNERSTONE BAPTIST CHURCH AKER, FRALEY, CHAVIS, SR., CHAVIS, JR., BYRD, HENSON, BYRON HOWELL, HENSON, WEBB, HICKS, SWANN, WOOD, LANE, SPELLMAN, AMAZIAH HOWELL, COSTON, COX, PRICE, WEBB, RON SAES 1-15 AND RACHAEL LOES 1-15

BLOOMBERG, KELLY, NEW YORK CITY POLICE DEPARTMENT, JOHN DOE S1-15 AND JANE ROES 1-15, NEW YORK CITY, CHARLES HYNES, THE KINGS COUNTY DISTRICT ATTORNEY'S OFFICE AND SAM SOES 1-10 AND SANDIE COES 1-10

136

546)558) Plaintiff Towns incorporates by reference all preceding paragraphs as if the same had been set forth herein in their entirety.

547)559) Said October 10th, 2013 Terror Threat speaks for itself as pertains to and/or establishes a violation of §291 of the New York State Human Rights Law.

548)560) Cornerstone defendants, did, jointly and/or severally conspire with one another to deprive plaintiff Towns of his constitutional right to freedom of religion and/or his right to exercise his religious beliefs, worship in the manner that he had chosen  and/or for utilizing his right to free religious speech and/or right of free religious expression and/or associating with whom he had chosen and/or speaking in the manner he had chosen and/or his right to exercise other constitutional and/or civil rights, and/or in retaliation for said plaintiff Towns' exercising said rights, including but not limited to his oral protest and religious proclamation of September 29th, 2013, as hereinabove set forth.

549)561) In addition thereto, said Cornerstone defendants were livid after plaintiff Towns rendered his September 29th, 2013 proclamation and immediately assaulted him thereafter.

550)562) Thus, said Cornerstone defendants, did privately conspire to retaliate against and attack plaintiff Towns because of their several and/or jointly religious animus against plaintiff's firmly held religious beliefs, as heretofore stated.

~~551)~~563) More particularly and *inter alia*, said Cornerstone defendants did conspire and/or coordinate the issuance of the October 10th, 2013 Terror Threat with the "input" and "cooperation" of the aforesaid municipal defendants, as previously detailed herein.

~~552)~~564) Likewise, said municipal defendants did actively engage in effectuating said discriminatory conduct by deploying armed defendants John Does 1-15 and/or Jane Roes 1-15 to intervene, detain, harass, arrest and/or otherwise subject plaintiff Towns to stated created threat at the defendant Cornerstone's principal location, to wit 562 – 574 Madison Street, Brooklyn, New York, on Sunday, October 13, 2013, and on Sunday, October 20, 2013. Said Cornerstone defendants admit that the said acts were done under color of law as the October 10th, 2013 Terror Threat specifically conveys said Cornerstone defendants obtained the joint support, "input", "cooperation" and/or aid of the within named municipal defendants.

~~553)~~565) Thus, each named defendant is in violation of said §291 of the New York State *Human Rights Law*, and said violation continues to date.

~~554)~~566) Plaintiff is entitled to recover damages for violation of said law.

COUNT 12 11—PLAINTIFF'S RECOVERY RIGHT FOR
DEFENDANTS' VIOLATION OF NEW YORK STATE
HUMAN RIGHTS LAW §296

CORNERSTONE BAPTIST CHURCH AKER, FRALEY, CHAVIS, SR., CHAVIS, JR., BYRD,
HENSON, BYRON HOWELL, HENSON, WEBB, HICKS, SWANN, WOOD, LANE,
SPELLMAN, AMAZIAH HOWELL, COSTON, COX, PRICE, WEBB,
RON SAES 1-15 AND RACHAEL LOES 1-15

BLOOMBERG, KELLY, NEW YORK CITY POLICE DEPARTMENT,
JOHN DOES 1-15 AND JANE ROES 1-15,
NEW YORK CITY, CHARLES HYNES,
THE KINGS COUNTY DISTRICT ATTORNEY'S OFFICE
AND SAM SOES 1-10 AND SANDIE COES 1-10

555)567) Plaintiff Towns incorporates by reference all preceding paragraphs as if the same had been set forth herein in their entirety.

556)568) Said October 10th, 2013 Terror Threat speaks for itself as pertains to and/or establishes a violation of §296 of the New York State Human Rights Law.

557)569) Cornerstone defendants, did, jointly and/or severally conspire with one another to deprive plaintiff Towns of his constitutional right to freedom of religion and/or his right to exercise his religious beliefs, worship in the manner that he had chosen  and/or for utilizing his right to free religious speech and/or right of free religious expression and/or associating with whom he had chosen and/or speaking in the manner he had chosen and/or his right to exercise other constitutional and/or civil rights, and/or in retaliation for said plaintiff Towns'

139

exercising said rights, including but not limited to his oral protest and religious proclamation of September 29th, 2013, as hereinabove set forth.

558)570) In addition thereto, said Cornerstone defendants were livid after plaintiff Towns rendered his September 29th, 2013 proclamation and immediately assaulted him thereafter.

559)571) Thus, said Cornerstone defendants, did privately conspire to retaliate against and attack plaintiff Towns because of their several and/or jointly religious animus against plaintiff's firmly held religious beliefs, as heretofore stated.

560)572) More particularly and *inter alia*, said Cornerstone defendants did conspire and/or coordinate the issuance of the October 10th, 2013 Terror Threat with the "input" and "cooperation" of the aforesaid municipal defendants, as previously detailed herein.

561)573) Likewise, said municipal defendants did actively engage in effectuating said discriminatory conduct by deploying armed defendants John Does 1-15 and/or Jane Roes 1-15 to intervene, detain, harass, arrest and/or otherwise subject plaintiff Towns to stated created threat at the defendant Cornerstone's principal location, to wit 562 – 574 Madison Street, Brooklyn, New York, on Sunday, October 13, 2013, and on Sunday, October 20, 2013. Said Cornerstone defendants admit that the said acts were done under color of law as

the October 10th, 2013 Terror Threat specifically conveys said Cornerstone defendants obtained the joint support, "input", "cooperation" and/or aid of the within named municipal defendants.

562)574) Ergo, each named defendant is in violation of said §296 of the New York State *Human Rights Law*, and said violation continues to date.

563)575) Plaintiff is entitled to recover damages for violation of his is said law.

## COUNT 13 12–PLAINTIFF'S RECOVERY RIGHT FOR DEFENDANTS' VIOLATION OF NEW YORK STATE CIVIL RIGHTS LAW §40

CORNERSTONE BAPTIST CHURCH AKER, FRALEY, CHAVIS, SR., CHAVIS, JR., BYRD, HENSON, BYRON HOWELL, HENSON, WEBB, HICKS, SWANN, WOOD, LANE, SPELLMAN, AMAZIAH HOWELL, COSTON, COX, PRICE, WEBB, RON SAES 1-15 AND RACHAEL LOES 1-15

BLOOMBERG, KELLY, NEW YORK CITY POLICE DEPARTMENT, JOHN DOES 1-15 AND JANE ROES 1-15, NEW YORK CITY, CHARLES HYNES, THE KINGS COUNTY DISTRICT ATTORNEY'S OFFICE AND SAM SOES 1-10 AND SANDIE COES 1-10

564)576)  Plaintiff Towns incorporates by reference all preceding paragraphs as if the same had been set forth herein in their entirety.

565)577) Said October 10th, 2013 Terror Threat speaks for itself as pertains to and/or establishes a violation of §40 of the New York State *Civil Rights Law.*

566)578) To wit, pursuant to §40 of said *Civil Rights Law,* the within October 10th, 2013 Terror Threat is presumptive evidence of a statutory violation and that said October 10th, 2013 Terror Threat was authorized by the defendant Cornerstone and/or cornerstone defendants.

567)

568)579) Cornerstone defendants, did, jointly and/or severally conspire with one another to deprive plaintiff Towns of his constitutional right to freedom of religion and/or his right to exercise his religious beliefs, worship in the manner that he had chosen  and/or for utilizing his right to free religious speech and/or right of free religious expression and/or associating with whom he had chosen and/or speaking in the manner he had chosen and/or his right to exercise other constitutional and/or civil rights, and/or in retaliation for said plaintiff Towns' exercising said rights, including but not limited to his oral protest and religious proclamation of September 29th, 2013, as hereinabove set forth.

569)580) In addition thereto, said Cornerstone defendants were livid after plaintiff Towns rendered his September 29th, 2013 proclamation and immediately assaulted him thereafter.

5̶7̶0̶)̶581) Thus, said Cornerstone defendants, did privately conspire to retaliate against and attack plaintiff Towns because of their several and/or jointly religious animus against plaintiff's firmly held religious beliefs, as heretofore stated.

5̶7̶1̶)̶582) More particularly and *inter alia*, said Cornerstone defendants did conspire and/or coordinate the issuance of the October 10th, 2013 Terror Threat with the "input" and "cooperation" of the aforesaid municipal defendants, as previously detailed herein.

5̶7̶2̶)̶583) Likewise, said municipal defendants did actively engage in effectuating said discriminatory conduct by deploying armed defendants John Does 1-15 and/or Jane Roes 1-15 to intervene, detain, harass, arrest and/or otherwise subject plaintiff Towns to stated created threat at the defendant Cornerstone's principal location, to wit 562 – 574 Madison Street, Brooklyn, New York, on Sunday, October 13, 2013, and on Sunday, October 20, 2013. Said Cornerstone defendants admit that the said acts were done under color of law as the October 10th, 2013 Terror Threat specifically conveys said Cornerstone defendants obtained the joint support, "input", "cooperation" and/or aid of the within named municipal defendants.

5̶7̶3̶)̶584) Thus, each named defendant is in violation of said §40 of the New York State *Civil Rights Law,* and said violation continues to date.

574)585) Pursuant to the statutory provisions contained in said law plaintiff is entitled to recover statutory penalties for "each and every violation" of said Civil Rights Law against each defendant violator.

575)586) Plaintiff shall seek to recover statutory penalty violations in the amount of $500 against each and every defendant herein for each and every worship service he was precluded from attending and/or participating in as a result of said defendants' acts; including but not limited to each 9:30 A.M. Sunday School service and 10:45 A.M., Worship Service, that he was precluded from attending for the period commencing Sunday, October 13, 2013 to date.

576)587) Plaintiff has duly complied with the requirements before seeking said recovery by having served the Attorney General of New York State with notice as hereto for set forth.

### COUNT 14 13–PLAINTIFF'S RECOVERY RIGHT FOR DEFENDANTS' VIOLATION OF NEW YORK STATE CIVIL RIGHTS LAW §40-c

CORNERSTONE BAPTIST CHURCH AKER, FRALEY, CHAVIS, SR., CHAVIS, JR., BYRD, HENSON, BYRON HOWELL, HENSON, WEBB, HICKS, SWANN, WOOD, LANE, SPELLMAN, AMAZIAH HOWELL, COSTON, COX, PRICE, WEBB, RON SAES 1-15 AND RACHAEL LOES 1-15

BLOOMBERG, KELLY, NEW YORK CITY POLICE DEPARTMENT, JOHN DOES 1-15 AND JANE ROES 1-15, NEW YORK CITY, CHARLES HYNES, THE KINGS COUNTY DISTRICT ATTORNEY'S OFFICE SAM SOES 1-10 AND SANDIE COES 1-10

577)588)  Plaintiff Towns incorporates by reference all preceding paragraphs as if the same had been set forth herein in their entirety.

578)589) Said October 10th, 2013 Terror Threat speaks for itself as pertains to and/or establishes a violation of §40-c of the New York State *Civil Rights Law*.

579)

580)590) Cornerstone defendants, did, jointly and/or severally conspire with one another to deprive plaintiff Towns of his constitutional right to freedom of religion and/or his right to exercise his religious beliefs, worship in the manner that he had chosen  and/or for utilizing his right to free religious speech and/or right of free religious expression and/or associating with whom he had chosen and/or speaking in the manner he had chosen and/or his right to exercise other constitutional and/or civil rights, and/or in retaliation for said plaintiff Towns' exercising said rights, including but not limited to his oral protest and religious proclamation of September 29th, 2013, as hereinabove set forth.

581)591) In addition thereto, said Cornerstone defendants were livid after plaintiff Towns rendered his September 29th, 2013 proclamation and immediately assaulted him thereafter.

582)592) Thus, said Cornerstone defendants, did privately conspire to retaliate against and attack plaintiff Towns because of their several and/or jointly

religious animus against plaintiff's firmly held religious beliefs, as heretofore stated.

583)593) More particularly and *inter alia,* said Cornerstone defendants did conspire and/or coordinate the issuance of the October 10th, 2013 Terror Threat with the "input" and "cooperation" of the aforesaid municipal defendants, as previously detailed herein.

584)594) Likewise, said municipal defendants did actively engage in effectuating said discriminatory conduct by deploying armed defendants John Does 1-15 and/or Jane Roes 1-15 to intervene, detain, harass, arrest and/or otherwise subject plaintiff Towns to stated created threat at the defendant Cornerstone's principal location, to wit 562 – 574 Madison Street, Brooklyn, New York, on Sunday, October 13, 2013, and on Sunday, October 20, 2013. Said Cornerstone defendants admit that the said acts were done under color of law as the October 10th, 2013 Terror Threat specifically conveys said Cornerstone defendants obtained the joint support, "input", "cooperation" and/or aid of the within named municipal defendants.

585)595) Said Cornerstone defendants admit that the said acts were done under color of law as the October 10th, 2013 Terror Threat specifically conveys said Cornerstone defendants obtained the joint support, "input", "cooperation" and/or aid of the within named municipal defendants.

146

586)596)  Thus, each named defendant is in violation of said §40-c of the New York State *Civil Rights Law,* and said violation continues to date. Plaintiff is entitled to recover penalties for violation of said law.

587)597) Pursuant to the statutory provisions contained in said law plaintiff is entitled to recover statutory penalties for "each and every violation" of said Civil Rights Law against each defendant violator.

588)598) Plaintiff shall seek to recover of statutory penalty violations in the amount of $500 against each and every defendant herein for each and every worship service; including but not limited to each 9:30 A.M. Sunday School service and 10:45 A.M., Worship Service, that he was precluded from attending for the period commencing Sunday, October 13, 2013 to date.

589)599) Plaintiff has duly complied with the requirements before seeking said recovery by having served the Attorney General of the State of New York, with notice as hereto for set forth.

590)

## COUNT 15 14– FAILURE OF DEFENDANTS
## TO AUDIT ACCOUNTS

CORNERSTONE BAPTIST CHURCH AKER, FRALEY, CHAVIS, SR., CHAVIS, JR., BYRD, HENSON, BYRON HOWELL, HENSON, WEBB, HICKS, SWANN, WOOD, LANE, SPELLMAN, AMAZIAH HOWELL, COSTON, COX, PRICE , WEBB, RON SOES 1-15 AND RACHAEL ROES 1-15 TO CONDUCT INDEPENDENT AUDITS

591)600) Plaintiff Towns occasionally made small offering contributions to defendant, Cornerstone.

592)601)  In such he retains the capacity to inform this Court of the mandatory by-law provisions for independent financial accountings.

593)602) As heretofore recited, defendant Cornerstone and its officers have failed to comply with the requirements of Article XII of said defendant Cornerstone's by-laws.

594)603)  That is, the requirement that the defendant Cornerstone appoint an independent certified accountant or certified public accountant to examine its books, records and/or accounts and its fiscal management system annually.

595)604)  Upon information and belief, persons, including but not limited to Rev. Davis, have demanded the defendant Cornerstone's officers and/or trustees perform required accounting.

~~596)~~605)  Upon information and belief, said defendant Cornerstone and its officers' failure to  perform such independent accountings continues to date.

~~597)~~606)  This failure has continued for more than nine (9) years.

~~598)~~607) This Court must impose its authority and direct said defendant Cornerstone and its officers to designate a certified public accountant or certified accountant to conduct the required examinations.

## DAMAGE CLAIMS

~~599)~~608) The plaintiff Towns is entitled to a damage award in the sum of Three Million ($3,000,000.00) Dollars for the conspiratorial conduct constituting a violation of **42 USC §1983,** as set forth in Count 1 of this complaint.

~~600)~~609) The plaintiff Towns is entitled to a damage award in the sum of Three Million ($3,000,000.00) Dollars for conduct constituting a violation of **42 USC §1983,** as set forth in Count 2 of this complaint.

~~601)~~610) The plaintiff Towns is entitled to a damage award in the sum of Three Million ($3,000,000.00) Dollars for conduct constituting a violation of **42 USC §1983,** as set forth in Count 3 of this complaint.

~~602)~~611) The plaintiff Towns is entitled to a damage award in the sum of Three Million ($3,000,000.00) Dollars for conduct constituting a violation of **42 USC §1983,** as set forth in Count 4 of this complaint.

~~603)~~612) The plaintiff Towns is entitled to a damage award in the sum of Three Million ($3,000,000.00) Dollars for conduct constituting a violation of **42 USC §1983,** as set forth in Count 5 of this complaint.

~~604)~~613) The plaintiff Towns is entitled to a damage award in the sum of Three Million ($3,000,000.00) Dollars for conduct constituting a violation of **42 USC §1985(3),** as set forth in Count 6 of this complaint.

614) The plaintiff Towns is entitled to a damage award in the sum of Three Million ($3,000,000.00) Dollars for conduct constituting in violation of **42 USC §1985(3),** as set forth in Count 7 of this complaint.

615) Plaintiff Towns is entitled to a damage award in the sum of Three Million ($3,000,000.00) Dollars for conduct constituting in violation of **42 USC §1981,** as set forth in Count 8 of this complaint.

~~605)~~616) The plaintiff Towns is entitled to a damage award in the sum of Three Million ($3,000,000.00) Dollars for conduct constituting in violation of 18 **USC §248,** as set forth in Count 9 of this complaint.

617) ~~The plaintiff Towns is entitled to a damage award in the sum of Three Million ($3,000,000.00) Dollars for intentional infliction of emotional distress, as set forth in Count 8 of this complaint.~~

618) The plaintiff Towns is entitled to a damage award in the sum of Three Million ($3,000,000.00) Dollars for conduct constituting in violation of 18 **USC §248,** as set forth in Count 9 of this complaint.

619) The plaintiff Towns is entitled to a damage award in the sum of Three Million ($3,000,000.00) Dollars for intentional infliction of emotional distress, as set forth in Count 10 of this complaint.

620) The plaintiff Towns is entitled to a damage award in the sum of Three Million ($3,000,000.00) Dollars for conduct constituting in violation of New York State Human Rights Law, §291, as set forth in Count 11 of this complaint.

621) The plaintiff Towns is entitled to a damage award in the sum of Three Million ($3,000,000.00) Dollars for conduct constituting in violation of New York State Human Rights Law, §296, as set forth in Count 12 of this complaint.

622) The plaintiff Towns is entitled to a damage award in the sum of Three Million ($3,000,000.00) Dollars for conduct constituting in violation of New York State Civil Rights Law §40, as set forth in Count 13 of this complaint.

623) The plaintiff Towns is entitled to a damage award in the sum of Three Million ($3,000,000.00) Dollars for conduct constituting in violation of New York State Civil Rights Law §40-c, as set forth in Count 14 of this complaint.

~~606)~~

~~607)~~624) ~~The plaintiff Towns is entitled to a damage award in the sum of Three Million ($3,000,000.00) Dollars for conduct constituting a "Hate Crime", as set forth in Count 9 of this complaint.~~

## DAMAGES FOR EMOTIONAL DISTRESS

~~608)~~625) The within complaint absolutely sets forth the causal connection between the extreme and/or outrageous, shameful, offensive and/or contemptible conduct, that is far beyond that abided in a civilized society and the emotional harm and/or distress that plaintiff Towns suffered and continues to suffer.

~~609)~~626) In addition thereto, the within plaintiff sustained and/or suffered the following emotional, anxiety and/or psychological pain and/or distress:

a) Plaintiff Towns, inter alia., suffered the emotional, anxiety and/or psychological pain associated with being threatened with physical harm, including but not limited to an existential threat for his life and/or safety;

b) The personal threat to his person for expressing his firmly held religious beliefs;

c) The personal threat to his person for exercising his personal religious rights, free speech rights, his interstate and intrastate right of travel and/or his right of free association;

d) The personal threat due to being targeted largely due to his racial heritage, ethnicity and/or skin color;

e) The personal emotional, anxiety and/or psychological pain plaintiff sustained by the municipal assault upon his person that demonstrated he had no rights that the municipal defendants were bound to respect;

f) The personal emotional, anxiety and/or psychological pain plaintiff sustained by the realization that all his future years in the United States of America remain clouded by the potential threat of illegal governmental coercion and the employment of unlawful lethal governmental force against plaintiff;

g) The plaintiff's ongoing ordeal of confronting the realistic "threat to life and/or person by defendant NYPD and the John and Jane Roes 1-15;

h) The plaintiff's ongoing ordeal of confronting the reality of being a forever governmental target of racism, without legal cause and/or justification;

i) The plaintiff's ongoing confrontation with the threat of intrusive governmental force and/or action, without legal cause and/or justification.

6̶1̶0̶)627) Hence, plaintiff Towns is entitled to a damage award in the sum of Three Million ($3,000,000.00) Dollars for the conduct committed by the respective defendants, as set forth in Count 8 and/or 9 of this complaint

## PLAINTIFF TOWNS' CLAIM FOR PUNITIVE DAMAGES

6̶1̶1̶)628) Cornerstone defendants, who are members and/or officials of defendant Cornerstone and sons and/or daughters of slaves, are found victimizing plaintiff for his firm religious beliefs and proclamations.

6̶1̶2̶)629) Such conduct is odious and offends the moral sensibilities of any constitutional democracy. However, said defendants' premeditated conduct in organizing and fomenting governmental misconduct to aid and abet the afore-described state action is such extreme misconduct as to mandate punitive sanctions.

6̶1̶3̶)630) The defendant NYPD's principal executive officer, defendant Kelly, having willingly and/or knowingly and/or intentionally and/or recklessly permitted said NYPD to persist in its conduct of racial animus and/or intolerance for multiple years and/or in likewise permitting the protracted violations of constitutional, statutory and/or civil rights of the public is conduct that is not only odious and offensive to our moral sensibilities but lays the groundwork for the destruction of our democracy.

614)631) Defendant Hynes, a guardian of our law enforcement system, offends, no less by corrupting his office and himself to join the vicious assaults upon plaintiff Towns and thus, his conduct is at least as reprehensible to the conduct of the above mentioned defendants if not more so.

615)632) No nation can endure if this Court and jury does not denounce such crimes against its constitutional democracy.

616)633) Thus, plaintiff Towns is entitled to punitive damages in the amount of Three Million ($3,000,000.00) Dollars against each named defendant herein, excluding such legal governmental entities that are immune to such damages.

617)634) For a Preliminary Injunction restraining each of the several named defendants from infringing upon plaintiff Towns' multiple constitutional, statutory and/or civil rights.

618)635) Directing the defendant Cornerstone and/or the Cornerstone defendants to retain, forthwith, an independent Certified Public Accountant to examine and/or audit the books, records, financial documents and/or condition of said defendant Cornerstone.

619)636) In addition thereto, affording plaintiff Towns such other and further legal redress and/or justice as this Court may deem appropriate under law, the Federal Rules of Civil Procedure and this Court's Local Rules.

**PLAINTIFF TOWNS DEMANDS A JURY TRIAL ON ALL ISSUES
TO WHICH HE IS ENTITLED UNDER LAW**

Dated: April 17, 2015~~March 13th, 2015~~

Plaintiff:

**Emanuel A. Towns**
90 TRACEY PLACE
APT. NO. C-2
ENGLEWOOD, NEW JERSEY 07631
201-674-8475
EMAIL ADDRESS: <u>STHDEVEL@GMAIL.COM</u>

## CERTIFICATION

The undersigned certifies that the foregoing statements are made under penalty of perjury and that the within *Proposed Third Amended Verified Complaint* has substantial merit in accord with Rule 11 of the Federal Rule of Civil Procedure.

Dated: April 17, 2015

EMANUEL A. TOWNS